**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| WILLIAM D. WRIGLEY, derivatively on behalf of FLOWERS FOODS, INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| GEORGE E. DEESE, ALLEN L. SHIVER, R. STEVEN KINSEY, KARYL H. LAUDER, BRADLEY K. ALEXANDER, RHONDA O. GASS, BENJAMIN H. GRISWOLD, IV, RICHARD A. LAN, MARGARET G. LEWIS, AMOS R. MCMULLIAN, JOSEPH VINCENT SHIELDS, JR., DAVID V. SINGER, JAMES T. SPEAR, MELVIN T. STITH, and C. MARTIN WOOD, III, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| FLOWERS FOODS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.     Plaintiff William D. Wrigley ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Flowers Foods, Inc. ("Flowers" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment, from at least February 7, 2013 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by Flowers and other related parties and non-parties with the Securities and Exchange Commission

("SEC"); b) press releases and other publications disseminated by certain of the defendants and other related non-parties; c) news articles, shareholder communications, and postings on Flowers's website concerning the Company's public statements; d) publicly available filings in a related securities class action lawsuit, including the opinion partly denying a motion to dismiss, captioned *In re Flowers Foods, Inc. Securities Litigation*, 7:16-cv-00222-WLS (M.D.Ga.) (the "Securities Class Action"); and e) other publicly available information concerning Flowers and the defendants.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      According to its public filings, Flowers is the second-largest producer and marketer of packaged bakery foods in the United States.  It operates two business segments: a direct-store-delivery segment ("DSD Segment") and a warehouse delivery segment ("Warehouse Segment").  The DSD Segment, representing 84% of total sales, operates 39 bakeries that market a wide variety of fresh bakery goods, which are sold through a direct-store-delivery model to retail and foodservice customers in the Southeast, Mid-Atlantic, New England, Southwest, California, and select markets in Nevada, the Midwest and the Pacific Northwest.   The Warehouse Segment, representing 16% of total sales, operates 10 bakeries that produce goods for national retail, foodservice, vending, and co-pack customers, which are delivered through customer's warehouse channels and on bakery mix plant.

3.      Unlike its main packaged bread producer competitors, Flowers relies heavily on an "Independent Distributor Model" to operate its DSD Segment.  The DSD Segment is comprised of independent distributors who own the rights to distribute certain brands of the Company's fresh packaged bakery foods in their geographic markets. Flowers has approximately 600 company-owned territories with the distribution rights for those territories available for sale

and an additional 230 company-owned and operated territories with the distribution rights that are not available for sale.

4.      The Company relies on "distributors" to deliver fresh baked goods to its customers (primarily grocery stores, mass retailers, and fast food chains).  Distributors are responsible for ordering products, stocking shelves, maintaining special displays, and visiting customers frequently to ensure adequate inventory and removing unsold goods.  The Company had approximately 4,100 distributors as of the end of 2012, 4,950 by the end of 2013, 5,200 by the end of 2014, 5,100 by the end of 2015, 5,128 by the end of 2016, and 5,593 by the end of 2017.

5.      Distributors operate in territories and pay Flowers for exclusive rights to operate in a territory.  Distributors pick up and deliver Flowers' products to retail locations, and Flowers pays distributors for deliveries after the retail locations pay Flowers.  Distributors can use their own vehicle or lease Flowers' trucks at a cost.

6.      On August 10, 2016, the Individual Defendants (defined herein) caused Flowers to reveal in a Current Report filed with the SEC that the U.S. Department of Labor ("DOL") notified Flowers that the Company was scheduled for a compliance review under the Fair Labor Standards Act ("FLSA").  The Individual Defendants further caused the Company to state that they intended to cooperate with the DOL, and that because the review process was confidential, the Individual Defendants would not comment further at that time.

7.      In response to this disclosure, news outlets reported the DOL compliance review on August 10, 2016.  In reporting the compliance review, *The Wall Street Journal* ("WSJ") noted that since July 2015, the DOL had brought at least two cases against companies related to the misclassification of employees as independent contractors and that Flowers was facing nearly

two dozen lawsuits by drivers (distributors) alleging they were misclassified as independent contractors rather than employees.[1]  Additionally, WSJ quoted an analyst with Pivotal Research Group who stated that if the DOL ultimately found Flowers in violation of the FLSA, Flowers' liability could top $1 billion in "back wages, penalties, fines, health care and so on," and that "[s]ooner or later this could lead to a complete recasting of their business model."

8.     On this news, Flowers' stock price fell $1.60 per share, or 9%, to close at $16.15 per share on August 10, 2016.

9.     Then, after the market closed on August 10, 2016, defendants issued a press release announcing second quarter 2016 financial results.   Therein, defendants announced revenue of $935 million, which fell below the Wall Street projection of $949 million.   In the press release, defendants also disclosed that they were lowering the Company's 2016 guidance, stating:

> **<u>Revised Fiscal 2016 Guidance</u>**
>
> Due to increased competitive activity and weak category volumes, the company lowered its outlook for fiscal 2016 sales, diluted EPS, and adjusted diluted EPS. Sales are now expected to be in the range of $3.930 billion to $3.986 billion, representing growth of approximately 4.0% to 5.5% over fiscal 2015 reported sales of $3.779 billion. EPS is now expected to be in the range of $0.88 to $0.93, representing a change of approximately -1.1% to +4.5% over fiscal 2015 EPS of $0.89. Adjusted EPS is now expected to be in the range of $0.90 to $0.95, representing a change of approximately -2.2% to +3.3% over fiscal 2015 adjusted EPS of $0.92.
>
> Commenting on the revised guidance, [CEO] Shiver said, "Our revised guidance takes into consideration soft consumer demand in the bakery category, as well as heightened promotional activity in our industry. The Flowers team has significant experience successfully navigating periods of heightened promotional activity like we are currently seeing, and we have already taken steps to address underperforming markets to improve profitability. Those markets have begun

---

[1]     *See* Erica E. Phillips, *Flowers Foods Faces Fair-Labor Review*, The Wall Street Journal (Aug. 10, 2016, 3:48 PM), http://www.wsj.com/articles/labor-department-taps-flowers-foods-for-fair-labor-compliance-review-1470834757.

steady improvement, and as sales grow, the company expects to leverage costs and realize efficiencies.

10.     On a conference call with analysts at 8:30 a.m. the next day, August 11, 2016, defendants Allen L. Shiver ("Shiver") and R. Steven Kinsey ("Kinsey") discussed, *inter alia*, the Company's second quarter 2016 results, the DOL compliance review, the Company's increased legal costs, and the Company's distribution model.

11.     On this news, Flowers' stock price fell another $1.20 per share, or 7.4%, to close at $14.95 per share on August 11, 2016.

12.     As alleged herein, throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) the Company's direct-store-distribution business model was based on knowingly and improperly classifying its distributors as independent contractors; (2) the Company's misclassification business model exposed the Company to existential risk; and (3) as a result of the foregoing, the Individual Defendants' statements about Flowers' business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

13.     Accordingly, as a result of the Individual Defendants' breaches as set forth herein, the Company has been damaged.

14.      In light of the events described herein, on September 28, 2016, Plaintiff issued a demand (the "Demand") pursuant to Georgia law on the Board to undertake an independent internal investigation into defendants' violations of Georgia and/or federal law, and to commence a civil action against each of the Individual Defendants to recover for the benefit of

the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties.  A true and correct copy of the Demand is attached hereto at Exhibit "A."

15.     To date, there has been no response to Plaintiff's demand.

16.     Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

17.     Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market. This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

**PARTIES**

21.     Plaintiff is a current shareholder of Flowers and has continuously held Flowers common stock since May 2012.

22.     Nominal defendant Flowers is a Georgia corporation, with its principal executive offices at 1919 Flowers Circle, Thomasville, Georgia 31757.  According to its public filings, Flowers is the second-largest producer and marketer of packaged bakery foods in the United States.

23.     Defendant George E. Deese ("Deese") has served as the Company's Non-Executive Chairman of the Board since December 31, 2014 and as a director since June 2004.

24.     Defendant Allen L. Shiver ("Shiver") has served as the Company's CEO, President and director since May 2013, January 2010 and March 2013, respectively.

25.     Defendant R. Steven Kinsey ("Kinsey") has served as the Company's Chief Financial Officer since September 2007.

26.     Defendant Karyl H. Lauder ("Lauder") has served as the Company's SVP and Chief Accounting Officer ("CAO") since 2008.

27.     Defendant Bradley K. Alexander ("Alexander") has served as the President of the Company's Fresh Packaged Bread Business Unit since May 2017.

28.     Defendant Rhonda O. Gass ("Gass") has served a director of the Company since January 2016.  Upon information and belief, defendant Gass is a citizen of Connecticut.

29.     Defendant Benjamin H. Griswold, IV ("Griswold") has served as a director of the Company since 2005.  Upon information and belief, defendant Griswold is a citizen of Maryland.

30.     Defendant Richard A. Lan ("Lan") has served as a director of the Company since 2016.

31.     Defendant Margaret G. Lewis ("Lewis") has served as a director of the Company since May 2014.

32.     Defendant Amos R. McMullian ("McMullian") has served as the Chairman Emeritus of the Company since January 2006.  Previously, defendant McMullian served as the Chairman of the Board since November 2000, as the Company's CEO from November 2000 until January 2004, as Chairman of the Board of Flowers Industries, Inc. ("Flowers Industries") from 1985 until March 2001 and as its CEO from 1981 until March 2001.

33.     Defendant Joseph Vincent Shields, Jr. ("Shields") has served as a director of the Company since March 2001.

34.     Defendant David V. Singer ("Singer") has served as a director of the Company since January 2010.

35.     Defendant James T. Spear ("Spear") has served as a director of the Company since January 2015.

36.     Defendant Melvin T. Stith ("Stith") has served as a director of the Company since July 2004.

37.     Defendant C. Martin Wood, III ("Wood") has served as a director of the Company since March 2001.

38.     Collectively, defendants Deese, Shiver, Kinsey, Lauder, Alexander, Gass, Griswold, Lan, Lewis, McMullian, Shields, Singer, Spear, Stith, and Wood, shall be referred to herein as the "Individual Defendants."

**DEFENDANTS' DUTIES**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Flowers and because of their ability to control the business and corporate affairs of Flowers, the Individual Defendants owed Flowers and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Flowers in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Flowers and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Flowers and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Flowers, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Flowers, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

41.     To discharge their duties, the officers and directors of Flowers were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Flowers were required to, among other things:

  a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

  b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all

applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c.    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; and

d.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

42.    All of the Individual Defendants were required to comply with Flowers' Code of Business Conduct and Ethics for Officers and Members of the Board of Directors (the "Code"). According to the Code:

**Compliance with Laws, Rules and Regulations**

We strive to comply with all laws, rules, and regulations of the places where we do business. It is the personal responsibility of each director and executive officer to adhere to the standards and restrictions imposed by those laws, rules and regulations.

\*   \*   \*

**Public Reporting and Senior Financial Officers**

We are a public company and as a result file reports and other documents with the Securities and Exchange Commission ("SEC") and the NYSE, on which our securities trade. As well, we issue press releases and make other public statements that include financial and other information about our business, financial condition and results of operations. We endeavor to make full, fair, accurate, timely and understandable disclosure in reports and documents we file with, or submit to, the SEC and in our press releases and public communications.

The CEO, Chief Financial Officer, Chief Accounting Officer and the Controller (collectively, the "Senior Financial Officers"), among others, have a supervisory role over the preparation of the disclosure in the reports and documents required to be filed by the Company. Adequate supervision includes properly reviewing and approving proposed disclosure for accuracy and completeness. The Senior Financial Officers are required to familiarize themselves with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company and are prohibited from

knowingly misrepresenting, or causing others to misrepresent facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

43.     According to its public filings, Flowers is the second-largest producer and marketer of packaged bakery foods in the United States.  It operates two business segments: a direct-store-delivery segment ("DSD Segment") and a warehouse delivery segment ("Warehouse Segment").  Its DSD Segment is by far the larger of the two segments, generating $3.2 billion in sales in Fiscal Year 2015, or 84% of the Company's total sales, operates 39 bakeries that market a wide variety of fresh bakery goods, which are sold through a direct-store-delivery model to retail and foodservice customers in the Southeast, Mid-Atlantic, New England, Southwest, California, and select markets in Nevada, the Midwest and the Pacific Northwest.  The Warehouse Segment, by contrast, generated $599.2 million in sales for the same period, representing 16% of total sales, operates 10 bakeries that produce goods for national retail, foodservice, vending, and co-pack customers, which are delivered through customer's warehouse channels and on bakery mix plant.

44.     Unlike its main packaged bread producer competitors, Flowers relies heavily on an "Independent Distributor Model" to operate its DSD Segment.  The DSD Segment is comprised of approximately 5,593 independent distributors who own the rights to distribute certain brands of the Company's fresh packaged bakery foods in their geographic markets.  Flowers has approximately 600 company-owned territories with the distribution rights for those territories available for sale and an additional 230 company-owned and operated territories with the distribution rights that are not available for sale.

45.     The Company relies on "distributors" to deliver fresh baked goods to its customers (primarily grocery stores, mass retailers, and fast food chains).  Distributors are responsible for ordering products, stocking shelves, maintaining special displays, and visiting customers frequently to ensure adequate inventory and removing unsold goods.

46.     Distributors operate in territories and pay Flowers for exclusive rights to operate in a territory.  Distributors pick up and deliver Flowers' products to retail locations, and Flowers pays distributors for deliveries after the retail locations pay Flowers.  Distributors can use their own vehicle or lease Flowers' trucks at a cost.

47.     Flowers has a long history of acquisitions, and has completed over 100 acquisitions since 1968.  These acquisitions have allowed Flowers to reach markets beyond its traditional core market in the South to markets including the Northeast and West Coast.  According to its Investor Fact Sheet released in November 2016, Flowers' acquisitions between 2005 and 2015 resulted in Flowers' products reaching a market including approximately 156.8 million additional people, and Flowers' products are currently available to approximately 85% of the U.S. population.

48.     From 2003 through present, Flowers has executed a growth strategy to reach more of the U.S. population with fresh breads, buns, rolls, and snack cakes through its DSD Segment.  The Company's access to the U.S. population for its fresh bakery products and brands through its DSD Segment has grown from about 38% in 2003 to 70% of the U.S. population as of the end of 2012, 79% of the population by the end of 2013, 81% by the end of 2014, and 85% by the end of 2015.

49.     Flowers controls nearly all aspects of its distributors' work. Below are examples of Flowers' control over its distributors:

a.   Pursuant to materially uniform distribution agreements, distributors may be called on to immediately perform or comply with all terms of their distribution agreement with Flowers.

b.   Flowers controls distributors' earnings by unilaterally setting the terms and prices for the sale of the Company's goods.

c.   Flowers must approve any sales of the routes by distributors.

d.   Flowers maintains authority to dictate distributors' accounting systems and to require distributors to use specific equipment, such as handheld inventory tracking devices, to track their work activity.

e.   Flowers has the right to control how distributors present themselves, such as requiring prior approval of advertising, controlling the writing on vehicles, and requiring them to maintain personal appearances.

f.   Flowers retains the right to tell distributors how often to service stores, when to schedule deliveries, when bread must be pulled off shelves, when it may be returned, and how products must be displayed.

g.   Flowers may require distributors to work on certain days, to make sales contacts on certain days, and to service stores on certain days.

**B.   Flowers Knowingly Misclassifies Its Distributors as Independent Contractors to Avoid Labor Costs**

50.   Around 1983, Defendants began re-classifying the employee delivery drivers of its then-approximately 40 bakery subsidiaries as independent contractor "distributors." By 1985, the Company had converted approximately 100 delivery routes to distributorships. Over time, more and more of the Company's routes would be converted to distributorships. In fact, the Company had approximately 4,100 distributors as of the end of 2012, 4,950 by the end of 2013,

5,200 by the end of 2014, 5,100 by the end of 2015, 5,128 by the end of 2016, and 5,593 by the end of 2017.

51.     However, the Individual Defendants knew that they were misclassifying the Company's distributors as independent contractors.

52.     Jimmy M. Woodward ("Woodward") joined Flowers in 1985 as a Tax Manager and served as CFO and Vice President of Flowers from 2000 to 2007.  Woodward volunteered to testify on behalf of the distributor plaintiffs and was deposed in *Rehberg et al. v. Flowers Foods, Inc. et al.*, W.D.N.C. Civil Action No. 3:12-cv-596 ("*Rehberg* Action"), a collective and class action that was filed on behalf of Flowers distributors alleging claims against the Company arising from the Company's misclassification of the distributors as "independent contractors."

53.     According to the plaintiffs in the *Rehberg* Action, Woodward contacted *Rehberg* plaintiffs' counsel after learning about the court's decision to certify a class of similarly situated individuals.   Woodward "told Plaintiffs' counsel that he was intimately involved in the development of the direct store distribution employment model at the heart of this litigation." The Motion to Take Woodward Deposition in the *Rehberg* Action:

> From 1986 until 2007 Mr. Woodward was employed as Senior Vice President, Chief Financial Officer and Chief Accounting Officer for Flowers Foods, Inc. He worked for Flowers when the company participated in developing the direct store distribution model within Flowers. During his tenure with Flowers, Mr. Woodward acquired information relating to the formation of the distributor program, the business structure of the distributor program, and the implementation of the distributorship program in North Carolina. He also has information about Flowers' knowledge of the Fair Labor Standards Act (FLSA) when it designed its distributor program.

54.     Woodward was deposed in connection with the *Rehberg* Action in August 2015. Although much of Woodward's testimony remains under seal, arguments and allegations that are not redacted are quite informative. For example, in the *Rehberg* plaintiffs' summary judgment

14

briefing, an unredacted table of contents states the following arguments based on Woodward's testimony:

> Flowers' former CFO testified that the IRS never formally approved Flowers' independent contractor model. . . Flowers' former CFO repeatedly warned Flowers' senior management and board about the risks of classifying its distributors as independent contractors. . . . Flowers' senior management is well aware that the distributors work more than 40 hours per week.

55.     Additionally, a January 22, 2016 analyst report authored by Lorem Ipsum Partners ("LIP Analyst Report")[2] provides key details regarding the Company's misclassification strategy based on two conversations spanning three hours between Loreum Ipsum Partners and Woodward. The second conversation was also attended by counsel from the labor and employment law firm Littler Mendelson P.C. ("Littler Mendelson").

56.     According to the LIP Analyst Report, Woodward agreed to testify against Flowers, his former employer of 31 years, because Woodward "knows this independent operator model is wrong and it has eaten at him for a long time." Woodward "raised concern about the program on many occasions," but was "told to pipe down." The *Rehberg* Action was the "first forum in which he could get the truth out."

57.     The LIP Analyst Report describes a legal opinion authored by Jones Day and received by Flowers' distributor coordinator following the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), stating that the Company was misclassifying its distributors. Woodward knew Flowers was failing to comply with franchise laws, and "went ballistic" upon learning of the legal opinion letter.

---

[2]     Available at https://issuu.com/ed056/docs/flo__investment_case_lorem_ipsum_20 (last retrieved on June 7, 2018).

58.     The LIP Analyst Report also quoted Woodward stating that it was common knowledge within the Company that distributors often had to work overtime without being compensated for it—that that was "the point of the whole program."

59.     The LIP Analyst Report describes Woodward's characterization of the Company's misclassification practices as a "labor strategy":

> [Woodward] described Flowers as a "cult" run by two larger than life CEOs during his tenure. Neither were open to divergent opinions. One threatened he could "find another accountant" when [Woodward] referred to the independent operator model as a "labor strategy," which he says it was when it began in 1985.

LIP Analyst Report at 8. As an example of Flowers' corporate culture, Woodward explained that most of the employees who had to settle with the SEC for insider trading[3] in Flowers' stock are still with the Company.  *Id.*

60.     The LIP Analyst Report discusses Defendants' knowledge, according to Woodward, that the Internal Revenue Service ("IRS") was going to rule adversely in response to the Company's application for a private letter ruling from the IRS regarding its classification of workers as independent contractors. LIP Analyst Report at 8. Upon learning this information, the Company withdrew its application before the IRS could issue its adverse ruling. *Id*. The LIP Analyst Report provides key details regarding the Company's arguments in its application to the IRS, including the Company's reliance on its counsel's argument that the route should be considered a "facility" for the purpose of the IRS independent contractor test requiring

---

[3]     On February 9, 2005, the SEC filed a "Complaint for Injunctive and Other Relief" in this Court, Civil Action File No. 6:05-CV-8 ("2005 SEC Insider Trading Action"), against seven Flowers employees alleging insider trading in the securities of Flowers. The employees allegedly learned about either the earnings release or the sale of Mrs. Smith's Bakeries frozen dessert business, or both, prior to the announcements, and purchased Flowers securities while in possession of this nonpublic, material information. On February 10, 2005, each of the employees filed Consents to Judgment [Dkt Nos. 2-8 in the 2005 SEC Insider Trading Action] and Consent Judgments were entered against each employee by the Court on February 23, 2005 [Dkt. Nos. 9-15].

investments in "facilities." *Id*. However, the IRS purportedly did not view the route as a "facility" because Flowers finances the distributor's route purchase. *Id*.

61.     Pleadings filed in the *Rehberg* Action confirm the reliability of the Woodward information contained in the LIP Analyst Report. For example, in its February 16, 2016 Order Denying Defendant's Motion for Summary Judgment ("*Rehberg* MSJ Order") [*Rehberg* Action Dkt. No. 205], the *Rehberg* court discussed Woodward's testimony that upper management at Flowers knew the IRS intended to rule against Flowers' position. According to the *Rehberg* plaintiffs, Woodward testified that although Flowers Vice President Chuck Rich testified that the IRS had found its distributors were independent contractors, in reality, the IRS had informed Flowers that it was going to rule against Flowers' request for a letter ruling relating to whether Flowers distributors were independent contractors. *Rehberg* MSJ Order at 37 ("Plaintiffs argue . . . Flowers' Vice President Chuck Rich testified that the IRS made the determination that Flowers' Distributors were independent contractors, (#146-44 [sic] at pp. 26–31), but did not disclose that the IRS had actually informed Flowers that it was going to rule against Flowers' request for a letter ruling. (Woodward Dep. 70–73)." Similarly, the LIP Analyst Report stated that, according to Woodward, "Flowers got wind that the IRS was going to rule adversely because Flowers finances the distributor's route purchase. Flowers promptly withdrew the request." LIP Analyst Report at 8.

62.     Following the IRS incident, according to the LIP Analyst Report, Woodward "convinced the company to at least make the independent operators 'statutory employees,' which he called a 'strange classification,' to remove the potential that Flowers would owe back FICA and unemployment tax." Flowers collects FICA from drivers and matches it and collects unemployment tax because the drivers are considered "statutory employees" in the eyes of the

IRS. According to the LIP Analyst Report, Woodward said, "he laid awake at night saying, 'How do I have notes receivable of $100mm from people I'm paying FICA and unemployment taxes on. That just doesn't make sense.'"

63.     In the *Rehberg* defendants' summary judgment reply briefing filed September 22, 2015 [*Rehberg* Action Dkt. No. 187], Flowers' counsel confirmed that in the late 1980's, Flowers requested IRS rulings that (i) its distributors were independent contractors and (ii) that its distributors were not statutory employees, and that Flowers ultimately withdrew its request for IRS rulings because "the IRS was going to formally rule that distributors were statutory employees . . . ."

64.     Regarding unpaid overtime, according to the LIP Analyst Report, Woodward said that he testified that Flowers executives and directors knew that distributors were working over 40 hours a week without getting paid overtime. LIP Analyst Report at 9. According to Woodward, not having to pay employee benefits such as overtime was the point of the distributor program and the pride of the Company. *Id.*

65.     Regarding the risks Flowers faces from misclassification litigation, according to the LIP Analyst Report, "[Woodward] said, internally, Flowers management has declared it can never lose one of these misclassification cases – not one." *Id.*

66.     The LIP Analyst Report concluded with a legal opinion contained in a Memorandum dated January 11, 2016, from Littler Mendelson to the analyst based on the firm's "high-level review of the information gathered during our January 7, 2016 call with Jimmy Woodward, the former Chief Financial Officer and Senior Vice President of Flowers Foods, Inc." ("Littler Memo").

67.     Littler Mendelson attorneys also "independently reviewed documents and information shedding light on the Company's business model, including a sample Distributor Agreement, the order granting class certification in the [*Rehberg* Action], and filings from other pending litigation . . . ." Based on this review, the Littler Memo identified numerous "highly questionable practices" of the Company related to its misclassification of its distributors as independent contractors, including:

- Even after a territory is purchased, the Company retains control over which customers and routes are added to, or removed from, the territory. For instance, distributors cannot refuse to service particular routes or customers the Company adds to the territory, irrespective of whether the Company consulted with distributors regarding same. If distributors resist servicing a particular route or customer, the Company treats the resistance as a breach of contract for failure to perform services in accordance with "good-industry standards";

- Distributors have little to no opportunity to negotiate with the Company or customers over pricing with respect to any part of the services they provide;

- The Company follows a "one man, one route" policy. In other words, notwithstanding the contractual provision granting distributors the right to delegate work, distributors rarely – if ever – hire their own employees or engage subcontractors to consistently perform services on their behalf;

- Depending on location, some (but not all) distributors are required to wear uniforms;

- Flowers has full-time employees who regularly perform the same tasks as distributors. For example, Flowers has approximately 500 routes that are serviced by employee "sales managers," and "territory managers." Further, these sales managers and territory managers are responsible for completing deliveries if a distributor "does not show up," or is otherwise unavailable;

- The Company sometimes holds "sales contests" for distributors. The winners are awarded a "vacation" from servicing their territories, and the deliveries are completed by the company's sales managers;

- The Company classifies all distributors as "statutory employees" for purposes of paying federal employment taxes (e.g., FICA and FUTA) and, apparently, state employment taxes as well;

- Flowers previously paid a portion of distributors' accounting fees if the distributors hired accountants recommended by the Company;

- Although distributors typically use large box-trucks to complete deliveries, they rarely own their own delivery vehicles prior to contracting with Flowers. Distributors either purchase old trucks from the Company, or lease them with the Company's assistance (e.g., the Company assists distributors in completing paperwork necessary to lease their vehicles). Flowers similarly will provide distributors with insurance to operate as a business, and effectively everything a distributor needs to begin operating as an "independent business." Ultimately, distributors typically do not have any substantial investment in their businesses beyond the delivery vehicles;

- Flowers engages "prospective distributors" (individuals who are unsure about whether they want to purchase a territory from the Company), and pays them a flat rate per week. The prospective distributors sometimes perform services for the Company (pursuant to a Prospective Distributor Agreement) for years without ever officially entering into a Distributor Agreement;

- Distributors typically do not advertise their own independent business to the public and, on the contrary, drive trucks that advertise product brands produced by Flowers. Distributors are not paid any fee for advertising Flowers. In addition, the Distributor Agreement precludes distributors from delivering "competitive products" for others. Lastly, in order to turn a profit, distributors must often perform services 6 to 7 days per week. Thus, even if distributors had the contractual right to perform services for other companies in theory, they likely are unable to do so in practice;

- Most distributors are unsophisticated, with little to no prior delivery experience or specialized training, and have not obtained any education beyond high school.

68.     After discussing the standard of analysis and summary of pertinent facts, as well as the Company's prospective options in light of pending misclassification suits, the Littler Memo concludes:

Flowers distributor model presents a large number of weaknesses that, unless they have changed, would make defense against any misclassification lawsuit particularly difficult. Further, given the model's many inherent weaknesses, the Company faces a long, uphill battle, without any prospect of quick or cost-effective long-term solutions.

69.    Many of the Company's "highly questionable practices" identified in the Littler

Memo continue to this day. Allegations from Flowers' distributors support the Littler Memo

findings. The following chart lists 27 lawsuits alleging distributor misclassification filed against

the Company and its subsidiaries since 2007.

| # | Date Filed | Name | Court | Case Number |
|---|---|---|---|---|
| 1 | 11/8/2016 | *Martins v. Flowers Foods, Inc. et al* | M.D. Fla. | 8:16-cv-03145 |
| 2 | 10/26/2016 | *Massey v. Flowers Foods Inc. et al* | W.D. Ok. | 5:16-cv-01233 |
| 3 | 6/20/2016 | *Donovan v. LePage Bakeries Park Street LLC et al* | D. Mass. | 3:16-cv-30100 |
| 4 | 5/9/2016 | *Schucker et al v. Flowers Foods, Inc. et al* | S.D.N.Y. | 7:16-cv-03439 |
| 5 | 4/27/2016 | *Medrano v. Flowers Foods, Inc. et al* | D.N.M. | 1:16-cv-00350 |
| 6 | 4/22/2016 | *Johnson v. Flowers Baking Co. of California, LLC* | E.D. Cal. | 2:16-cv-00840 |
| 7 | 3/25/2016 | *Boulange et al v. Flowers Foods, Inc. et al* | E.D. Pa. | 2:16-cv-02581 |
| 8 | 3/14/2016 | *Zapata et al v. Flowers Foods, Inc. et al* | S.D. Tex. | 4:16-cv-00676 |
| 9 | 1/28/2016 | *Rodriguez et al v. Flowers Foods, Inc. et al* | S.D. Tex. | 4:16-cv-00245 |
| 10 | 1/20/2016 | *McCurley et al v. Flowers Foods, Inc. et al* | D.S.C. | 5:16-cv-00194 |
| 11 | 12/4/2015 | *Wordlaw et al v. Flowers Foods, Inc. et al* | N.D. Ga. | 3:15-cv-00187 |
| 12 | 12/3/2015 | *Noll et al v. Flowers Foods, Inc. et al* | D. Me. | 1:15-cv-00493 |
| 13 | 12/2/2015 | *Neff et al v. Flowers Foods, Inc. et al* | D. Vt. | 5:15-cv-00254 |
| 14 | 12/1/2015 | *Carr et al v. Flowers Foods, Inc. et al* | E.D. Pa. | 2:15-cv-06391 |
| 15 | 12/1/2015 | *Rosinbaum et al v. Flowers Foods, Inc. et al* | E.D.N.C. | 7:16-cv-00233 |
| 16 | 10/26/2015 | *Soares, et al v. Flowers Foods Inc. et al* | N.D. Cal. | 5:15-cv-04918 |
| 17 | 10/21/2015 | *Richard, et al v. Flowers Foods Inc. et al* | W.D. La. | 6:15-cv-02557 |
| 18 | 9/29/2015 | *Bowden et al v. CK Sales Company, LLC et al* | D. Mass. | 1:15-cv-13464 |
| 19 | 9/28/2015 | *Brownfield et al v. Flowers Baking Co. of* | E.D. Cal. | 2:15-cv-02034 |
| 20 | 7/20/2015 | *Coyle v. Flowers Foods Inc. et al* | D. Ariz. | 2:15-cv-01372 |
| 21 | 7/7/2015 | *Martinez et al v. Flowers Foods, Inc. et al* | C.D. Cal. | 2:15-cv-05112 |
| 22 | 7/2/2015 | *Stewart et al v. Flowers Foods, Inc. et al* | W.D. Tenn. | 1:15-cv-01162 |
| 23 | 4/10/2015 | *Porreca et al v. Flowers Baking Co. of California,* | E.D. Cal. | 1:15-cv-00732 |
| 24 | 1/6/2015 | *Bokanoski et al v. LePage Bakeries Park St., LLC* | D. Conn. | 3:15-cv-00021 |
| 25 | 6/10/2013 | *Meredith v. Sara Lee Fresh, Inc. et al* | N.D. Cal. | 4:13-cv-02649 |
| 26 | 9/12/2012 | *Rehberg et al v. Flowers Foods, Inc. et al* | W.D.N.C. | 3:12-cv-00596 |
| 27 | 7/2/2007 | *Morrow et al v. Flowers Foods, Inc. et al* | M.D. Ala. | 3:07-cv-00617 |

70.     For example, on October 26, 2016, Flowers distributor Jared Massey ("Massey") filed a complaint against Flowers and Flowers Baking Co. of Denton LLC in the U.S. District Court for the Western District of Oklahoma, Case No. 5:16-cv-1233, alleging violations of the FLSA, 29 U.S.C. § 201 *et seq.*; Violation of Oklahoma Minimum Wage Act 40 O.S. 197 *et seq.*; Family Medical Leave Act, 29 U.S.C. 2601 *et seq.*; Common Law Fraud; Negligent Misrepresentation; Unjust Enrichment; Money Had and Received; Defamation; False Imprisonment; Intentional Infliction of Emotional Distress; Civil Conspiracy; Negligent Hiring, Retention, Supervision And Training; and Breach Of Contract ("Massey Complaint").

71.     The Massey Complaint alleges Massey was hired by Flowers through a third-party staffing firm in June 2013. Massey was told in February 2014 that his job was for "prospective distributors" and "if he wanted to keep his employment he would need to purchase a route to become an 'independent distributor'" for Flowers through its subsidiary. In June 2014, Massey "was forced to sign a Distributor and licensing agreement whereby [Massey] would become an 'independent distributor' for the Defendants." Massey would still be required to perform the same services—picking up, delivering, and stocking bakery and snack food products in a predetermined territory at predetermined times, and processing the distribution and transactions through a hand-held computer provided by Defendants.

72.     After signing the distributor agreement, Massey's duties and work times did not change, and he continued to work 70-80 hours per week. In addition, although Massey was supposed to have the exclusive right to distributions within his designated area and be able to run and control his business, Massey never had control over his business and Flowers allowed other distributors to service and maintain properties in Massey's purported territory. For example, the Massey Complaint alleges:

Despite the Defendant's promise that the Plaintiff would be able to operate his own business, the Distribution Agreement and the Defendants' current policies and procedures allow the Defendants to control virtually all aspects of the Plaintiff's distribution including the price of products, what stores the distributor will distribute to, what products to provide to which store, the manner in which it is displayed, time for distribution of products, and even during certain promotions such as "Big Cake Week" would order products from itself for the Plaintiff's customers.

73.    The Massey Complaint details the Company's continuing practice of retaining control over which customers and routes are added to, or removed from, distributors' territory. For example, Massey was not allowed by Flowers to refuse to service two low-volume, high-labor stores that were not disclosed to Massey at the time Massey purchased his route. Upon requesting a detailed listing of the stores within his territory and other documents, a Flowers employee told Massey, "You don't tell us what to do, we tell you what to do!"

74.    The Massey Complaint also provides details regarding Flowers' tactics to exculpate themselves from misclassification liability. For example, on December 2, 2015, according to the Massey Complaint, Flowers attempted to incentivize distributors to incorporate themselves and sign a class-action waiver, which Massey and several other distributors refused to sign. On December 23, 2015, Flowers sent out several 10-day breach letters to the distributors that refused to incorporate themselves or sign the class-action waiver. Flowers sends these letters to distributors if distributors do not follow directions as a way of telling distributors that if they do not comply, the distributor's route will be taken away.

75.    Other complaints, including at least 20 collective and/or class action complaints filed by distributors challenging the Company's misclassification of its distributors further demonstrate the Company's willful misclassification "labor strategy" has continued unabated.

76.    Flowers' continued "labor strategy" of intentional misclassification is partly the result of the Company's emphasis on "continuity of philosophy" over decades. For example, on

the Company's May 16, 2013 conference call discussing the Company's first quarter 2013 results, commenting on Defendant Shiver's transition to CEO at the Company's May 22, 2013 Shareholder Meeting, Defendant Deese discussed the importance of continuity of leadership and philosophy at Flowers:

> Since Flowers was founded in 1919, which is 94 years ago, we have only had 5 individuals in the CEO position. Next week, the sixth Flowers CEO will take that responsibility. At Flowers Foods, we strongly believe in continuity of leadership and continuity of philosophy, which we think has been a real competitive advantage for Flowers Foods through the years.

### C.    Flowers Faces Mounting Challenges to Its Misclassification

77.    In March 2013, the U.S. District Court for the Western District of North Carolina conditionally certified a class action for claims under the FLSA in the *Rehberg* Action.

78.    In May 2014, the Wage and Hour Division of the DOL released a revised "Fact Sheet 13: Am I an Employee?: Employment Relationship Under the Fair Labor Standards Act (FLSA)" concerning the meaning of "employment relationship" and the significance of that determination in applying provisions of the FLSA.

79.    On March 24, 2015, the U.S. District Court for the Western District of North Carolina issued an Order in the *Rehberg* Action [*Rehberg* Action Dkt. No. 129] (i) granting the plaintiffs' motion for class certification and (ii) denying the defendants' motion to decertify class, stating in part,

> Moreover, the primary inquiry for the court at this point is to determine whether or not all distributors were misclassified as independent contractors and whether they are truly employees within the meaning of the FLSA. The issue of whether the distributors are entitled to overtime pay, all exemptions considered, can be dealt with after the court makes its initial decision as to whether they are "employees" within the meaning of the FLSA.
>
> *    *    *
>
> Defendants exaggerate isolated differences among the distributors and ignore the larger picture of the issue at hand—that all distributors are subject to Defendants'

uniform policies. Given that Defendants have a well-established company policy of classifying all distributors as independent contractors, the court is less concerned by the variations in Plaintiffs' employment circumstances.

The court also notes that Defendants, who now argue that determining independent contractor status requires fact-intensive individualized inquiries, apparently had no difficulty in classifying all distributors as independent contractors when asking them to sign Distributor Agreements.

*   *   *

[T]he court finds that members of the proposed class are "similarly situated" for the purposes of collectively adjudicating their FLSA claims. The court will therefore deny Defendants' Motion to Decertify and allow this action to proceed collectively.

80.     On May 21, 2015, the U.S. Fourth Circuit Court of Appeals denied the Company's request to appeal the district court's March 23, 2015 class certification decision in the *Rehberg* Action [*Rehberg* Action Dkt. No. 140].

81.     On July 15, 2015, the DOL issued Administrator's Interpretation No. 2015-1, entitled "The Application of the Fair Labor Standards Act's "Suffer or Permit" Standard in the Identification of Employees Who Are Misclassified as Independent Contractors" ("DOL Administrator's Interpretation").[4]   The DOL Administrator's Interpretation warned companies that "[a]lthough independent contracting relationships can be advantageous for workers and businesses, some employees may be intentionally misclassified as a means to cut costs and avoid compliance with labor laws." The DOL Administrator's Interpretation further warned companies of potential enforcement actions stating, "[t]he Department of Labor's Wage and Hour Division (WHD) continues to receive numerous complaints from workers alleging misclassification, and the Department continues to bring successful enforcement actions against employers who misclassify workers. In addition, many states have acknowledged this problematic trend and

---

[4]     Available at https://www.blr.com/html_email/AI2015-1.pdf (last retrieved on June 6, 2018).

have responded with legislation and misclassification task forces." The DOL Administrator's Interpretation also provided additional guidance towards the criteria companies should use in evaluating whether a worker was an employee or independent contractor, stating "[i]n sum, most workers are employees under the FLSA's broad definitions."

82.     On February 16, 2016, the U.S. District Court for the Western District of North Carolina issued the *Rehberg* MSJ Order on: (i) Plaintiff's Motion for Partial Summary Judgment; (ii) Defendants' Motion for Summary Judgment; and (iii) Defendants' Motion to Strike Portions of Declarations Submitted in Opposition to Defendants' Motion for Summary Judgment [*Rehberg* Action Dkt. No. 205].

83.     Rejecting the defendants' request to find that the "Outside Sales Exemption" outlined in 29 U.S.C. § 213(a)(1) exempted Flowers' distributors from the FLSA's overtime provisions, the *Rehberg* MSJ Order found, *inter alia*, that "Plaintiffs have set forth evidence showing that many Plaintiffs testified that they had little to no ability to make sales, and that sales to customers were largely controlled by Flowers' sales and marketing team." The *Rehberg* MSJ Order also rejected the defendants' request to find Flowers' distributors exempt from the FSLA under the Motor Carrier Act, 29 U.S.C. § 213(b)(1). Finally, as discussed above, the *Rehberg* MSJ Order also confirmed the validity of the LIP Analyst Report and the information contained therein by relying on the same information provided by Woodward's sealed testimony.

84.     On June 29, 2016, the U.S. District Court for the District of Connecticut in *Bokanoski*, et al. v. *LePage Bakeries Park St., LLC*, et al., Case No. 3:15-cv-21, issued a "Ruling re: Defendants' Motion for Partial Judgment on the Pleadings (Doc. No. 58) & Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. No. 68). The district court found, *inter alia*, that the distributor plaintiffs in a class action under Connecticut law could recover for unjust

enrichment "if sufficient evidence is adduced establishing that the contractual provisions are, in fact, void, and no adequate remedy at law exists to remedy the unjust allocation of money to the plaintiffs' detriment . . . ."

85.     On July 29, 2016, an article entitled, "Flowers stock slips amid movement on litigation" was published by BakingBusiness.com regarding the *Rehberg* Action, and stated, in part:

> THOMASVILLE, GA. — Flowers Foods, Inc.'s share price fell 3.9% on July 27 — the sharpest decline since early February — after plaintiffs in a Fair Labor Standards Act lawsuit dating back to 2012 filed a motion in the U.S. District Court for the Western District of North Carolina requesting a pretrial conference.
>
> At issue in the case is whether the litigants should be classified as Flowers employees, qualifying for overtime pay, or independent contractors, the current arrangement.
>
> After moving as high as $19.62 per share July 26 in New York Stock Exchange trading, Flowers' share price closed at $18.91. A day later, Flowers shares fell 3.9% to close at $18.18.

86.     On August 10, 2016, Flowers disclosed in a Current Report filed with the SEC that the DOL notified Flowers that the Company was scheduled for a compliance review under the FLSA. The Company further stated that it intended to cooperate with the DOL, and that because the review process was confidential, Flowers would not comment further at that time.

87.     In response to this disclosure, news outlets reported the DOL compliance review on August 10, 2016. In reporting the compliance review, WSJ noted that since July 2015, the DOL had brought at least two cases against companies related to the misclassification of employees as independent contractors and that Flowers was facing nearly two dozen lawsuits by drivers (distributors) alleging they were misclassified as independent contractors rather than

27

employees.[5] Additionally, WSJ quoted an analyst with Pivotal Research Group who stated that if the DOL ultimately found Flowers in violation of the FLSA, Flowers' liability could top $1 billion in "back wages, penalties, fines, health care and so on," and that "[s]ooner or later this could lead to a complete recasting of their business model."

88.    On August 30, 2016, the U.S. District Court for the District of Arizona granted conditional class certification under the FLSA related to a complaint filed against Flowers and one of its subsidiaries on July 20, 2015, by Terry Coyle alleging he was misclassified as an independent contractor.  *See* Dkt. No. 205, *Coyle v. Flowers Foods Incorporated et al*, Case No. 2:15-cv-01372.

89.    On September 20, 2016, the U.S. District Court for the Western District of Tennessee adopted the magistrate judge's August 12, 2016 report and recommendation, and granted conditional class certification under the FLSA to a class of Flowers distributors operating out of designated warehouse locations in Tennessee. *See* Dkt. No. 86, *Stewart et al v. Flowers Foods, Inc. et al*, Case No. 1:15-cv-01162.

90.    On October 21, 2016, Flowers filed a Current Report on Form 8-K with the SEC disputing an October 20, 2016 analyst report of BMO Capital Markets which had stated that the Company had "reiterated its confidence in resolving outstanding legal issues without a material impact on its earnings and operations" at the National Association of Convenience Stores Conference. The Form 8-K stated, in part:

> This [BMO Capital Markets'] statement does not reflect the Company's position on its outstanding lawsuits. As previously disclosed, the Company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the stage of the complaints and the claims and issues presented, the Company cannot

---

[5]    *See* Erica E. Phillips, *Flowers Foods Faces Fair-Labor Review*, The Wall Street Journal (Aug. 10, 2016, 3:48 PM),  https://www.wsj.com/articles/labor-department-taps-flowers-foods-for-fair-labor-compliance-review-1470834757.

reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits. For additional information regarding these lawsuits, the Company directs investors to the disclosure previously made in its most recent filings with the Securities and Exchange Commission.

91.     On October 24, 2016, the U.S. District Court for the District of South Carolina granted conditional class certification under the FLSA related to a complaint filed against Flowers and one of its subsidiaries in January 20, 2016 by Paul McCurley alleging he was misclassified as an independent contractor.

92.     On November 7, 2016, the U.S. District Court for the District of Vermont granted conditional class certification under the FLSA related to a complaint filed against Flowers and certain of its subsidiaries on December 2, 2015 by Nick Neff and other plaintiffs alleging they were misclassified as independent contractors. *See* Dkt. No. 56, *Neff et al v. Flowers Foods, Inc. et al*, Case No. 5:15-cv-00254.

93.     On November 7, 2016, Flowers' subsidiary, Lepage Bakeries ("Lepage"), reached an agreement to settle a lawsuit seeking class action treatment (*Bokanoski et al. v. Lepage Bakeries Park Street, LLC and CK Sales Co., LLC*), originally filed by Bart Bokanoski and certain other plaintiffs in the U.S. District Court for the District of Connecticut on January 6, 2015, for $1.25 million, including attorneys' fees, as well as non-economic terms. *See* Dkt. No. 116, *Bokanoski et al. v. Lepage Bakeries Park St., LLC et al*, Case No. 3:15-cv-00021.

94.     In its quarterly report for the Company's third quarter 2016 results filed with the SEC on Form 10-Q on November 9, 2016, the Company stated it was "cooperating with the DOL" with respect to the DOL's notification of compliance review under the FLSA. Flowers also acknowledged that the Company was "defending 24 complaints filed by distributors alleging that such distributors were misclassified as independent contractors. Eighteen of these lawsuits seek class and/or collective action treatment."

95.     On December 9, 2016, the Company filed a Current Report on Form 8-K announcing that the parties had reached an agreement in the *Rehberg* Action to settle the claims against Flowers and Flowers Baking Co. of Jamestown, LLC for $9 million.

96.     On December 13, 2016 and December 20, 2016, the U.S. District Court for the Southern District of Texas granted conditional class certification under the FLSA related to two complaints filed against Flowers, on January 28, 2016 by David Rodriguez and other plaintiffs and on March 14, 2016 by Raul Zapata and other plaintiffs, alleging they were misclassified as independent contractors. *See* Dkt. No. 53, *Rodriguez et al v. Flowers Foods, Inc. et al*, Case No. 4:15-cv-00245; Dkt. No. 40, *Zapata et al v. Flowers Foods, Inc. et al*, Case No. 4:15-cv-00676.

## D.     Defendants' False and Misleading Statements During the Relevant Period

### 1.     Fourth Quarter and Fiscal Year 2012 Results

97.     On February 7, 2013, Defendants announced the Company's fourth quarter and fiscal year 2012 results. On that day, Flowers issued a press release entitled, "Flowers Foods Reports Fourth Quarter and Fiscal 2012 Results." The Individual Defendants touted a 64.7% increase in diluted earnings-per-share (EPS) for the quarter, to $0.28, and an increase of 8.9% to $0.98 EPS for the year.

98.     Flowers held off on providing "specific guidance" for 2013 pending the outcome of "possible acquisitions," but the Individual Defendants noted results for 2013 were expected to meet or exceed long-term goals of 5% to 10% sales growth and double-digit earnings per share growth, excluding one-time charges.

99.     The Individual Defendants also discussed the Company's margins, stating that its EBITDA margin was 11.5% for the quarter and 10.9% for the year, touted its operating margin (EBIT) improvement to 8% in the quarter and "up slightly" for the year, and stated that its gross

margin for the quarter and year were 47.9% and 46.9%, respectively. The Individual Defendants explained the Company's "relatively flat" margins, stating, "Higher ingredient costs as a percent of sales were offset by lower workforce-related costs as a percent of sales, production volume increases, and increased manufacturing efficiencies."

100.    The Individual Defendants also discussed the exit of Hostess Brands from the marketplace in November 2012 due to bankruptcy. On January 11, 2013, Flowers had announced an agreement with Hostess to be the stalking horse bidder in the bankruptcy process for certain Hostess bread bakeries and bread brands. The Individual Defendants noted a competitive auction was scheduled for February 28, 2013, followed by a sale order hearing on March 5, 2013.

101.    In the release, Defendant Deese discussed the Company's acquisitions of Tasty Baking Company ("Tasty"), Lepage, and the Company's announcement of an agreement to acquire the rights to the Sara Lee and Earthgrains brands in California in the fourth quarter. The Sara Lee and Earthgrains transaction was scheduled for completion on February 23, 2013 with respect to Southern California, followed by a staged roll-out of the acquired brands in the remainder of the state.

102.    Flowers' fourth quarter 2012 selling, distribution, and administrative ("SD&A") costs as a percent of sales were 36.5%, compared to 36.8% in the prior year. The Individual Defendants touted the Company's "ability to leverage costs on increased sales" as the primary reason for the decrease in SD&A costs.

103.    Regarding its DSD Segment, the Individual Defendants caused the Company to report an increase of 13.9% in its sales during fourth quarter 2012, reflecting volume increases of 6.2% as well as a contribution of 7.7% from the Lepage acquisition. Operating income for the

DSD segment was $59.2 million, or 9.6% of sales for the fourth quarter, compared to $40.7 million, or 7.5% of sales, in fourth quarter 2011.

104.    During its earnings conference call on February 7, 2013, in response to questions from analyst Farha Aslam of Stephens Inc. regarding gross profit vs. SD&A costs, Defendant Kinsey responded, "When you look at SD&A a lot of the distribution costs is down there so getting the product to the market, there was some cost incurred with that as well as we began to ramp up in California as Allen [Shiver] said in his comments. And there's been significant cost associated with that as well."

105.    During the call, Jonathan Feeney of Janney Capital Markets specifically asked whether the "traditional Flowers business model of all owners-operators" would continue with Flowers' potential share gain and assets that the Company would be integrating. Defendant Deese dodged the question, stating, "You know, we did say upfront there's just some things we cannot talk about. As you know, this has been handled in bankruptcy court and it's very technical and legal. So we can't speculate on the future because things are not final, not only from the court standpoint but also for competitive reasons that we just can't comment on that beyond what we already said."

106.    Fielding a question from Heather Jones of BB&T Capital Markets regarding the incremental distribution costs to be expected from Hostess share gains, Defendant Kinsey stated, "Yeah Heather, if you recall the distribution from our manufacturing facilities to our distribution centers, that's ramped up quite a bit to get the additional volume into the marketplace so that would be the primary driver of the distribution cost increase. So you're correct in your assumption on the discount structure—that is a relatively cost of percentage compared to sales. The big driver would be transportation from the plants to the distribution centers." In response to

follow-up questions, Defendant Kinsey added, "Our targeted SD&A as a percent of sales is somewhere around 36%, 35% to 36% so we're not far outside of that range and we should be able to continue to see that improve."

107.    As a result of these positive statements concerning the Company's continued growth with controlled labor costs, without mention of the Company's existential risk faced by its misclassification of its distributors, including total liability in excess of $1 billion in lost wages, benefits, penalties, fines and other damages, Flowers stock closed at $28.24 on February 7, 2013, up from a close of $27.89 on February 6, 2013.

108.    The Company's fourth quarter and full year financial results for the fiscal year ended December 29, 2012, were incorporated in its fiscal year 2012 Form 10-K and filed with the SEC on February 20, 2013 ("Fiscal 2012 Form 10-K"). The Fiscal 2012 Form 10-K was signed by defendants Deese, Kinsey, and Lauder, and reaffirmed the Company's financial results announced in the press release issued on February 7, 2013.

109.    In its Fiscal 2012 Form 10-K, the Company misleadingly and generically warned investors that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service providers . . . ." This warning misleadingly placed its independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

110.    The Fiscal 2012 Form 10-K discussed the Company's "market expansion efforts . . . driven by our individual bakeries as they extend their service boundaries by serving new

customers in territories adjacent to their current service areas." The individual bakeries "accomplish this" in part by "adding our direct-store-distribution structure . . . ." The Company touted this "growth strategy" as "proven successful, evidenced by our sales and net income compound average annual growth rate of 8.4% and 8.5%, respectively, over the last five years."

111.    Flowers also claimed in the Fiscal 2012 Form 10-K that it "strive[s] to maintain good relationships and ongoing communications with all our team members. We are committed to equal employment opportunities, meeting all federal and state employment laws, and striving to respect the dignity of all our team members and associates." In truth, the Company was not committed to meeting all federal and state employment laws, and instead was committed to a "labor strategy" centered on the misclassification of its distributors as independent contractors to save on labor costs, including the payment of overtime wages.

112.    The Fiscal 2012 Form 10-K falsely stated that the Company "employ[ed] approximately 9,800 people." In truth, the Company at the time employed approximately 13,900 people, a figure including the Company's approximately 4,100 distributors the Company was misclassifying as independent contractors at the time.

113.    The Fiscal 2012 10-K also falsely assured, "We believe that we are currently in material compliance with applicable federal, state and local laws and regulations." In truth, the Individual Defendants knew but did not disclose that the Company was not in material compliance with federal, state, and local laws and regulations that required its distributors to be classified as employees.

114.    Indeed, the Fiscal 2012 Form 10-K also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.[6]

115.     Regarding the duties of its distributors, the Fiscal 2012 Form 10-K acknowledged that these duties included "determining appropriate order levels, delivering products from bakeries to independent distributors for direct delivery to customer stores, stocking shelves, maintaining special displays, and visiting customers daily to ensure adequate inventory and removing unsold goods." The Fiscal 2012 Form 10-K also described the Company's practice of providing hand-held computers to the independent distributors to use for "daily ordering, transactions, and to manage their businesses," and then charging distributors an "administrative fee" for their use, totaling $4.9 million in 2012, $4.6 million in 2011, and $3.7 million in 2010. The Company acknowledged that this administrative fee "reduces the [C]ompany's selling, distribution and administrative expenses . . . ."

116.     The Fiscal 2012 Form 10-K also touted the Company's ability to closely track inventory and sales using distributors' hand-held computers and proprietary software:

> Our proprietary software permits distributors to track and communicate inventory data to bakeries and to calculate recommended order levels based on historical sales data and recent trends. These orders are electronically transmitted to the appropriate bakery on a nightly basis. This system ensures that distributors have an adequate supply of the right mix of products to meet retail and foodservice customers' immediate needs. We believe our system minimizes returns of unsold goods.

> In addition to handheld computers, we maintain an information technology ("IT") platform that allows us to accurately track sales, product returns, and profitability by selling location, bakery, day, and other criteria. The system provides us with daily real time, online access to sales and gross margin reports, allowing us to

---

[6]     All emphasis added, unless otherwise stated.

make prompt operational adjustments when appropriate. It also permits us to forecast sales and improve our in-store product ordering by customer. Our hand-held computers are integrated into this IT platform.

We also use PBS [pay-by-scan] to track and monitor sales and inventories more effectively. PBS allows the independent distributors to bypass the often lengthy product check-in at retail stores, which gives them more time to merchandise products. PBS also benefits retailers, who only pay suppliers for what they actually sell, or what is scanned at checkout. During fiscal 2012 approximately $863.9 million of our DSD segment sales came through our PBS system.

117.   In its Fiscal 2012 Form 10-K, the Company repeatedly touted the benefits of classifying its distributors as independent contractors: "Independent distributors, highly motivated by financial incentives from their territory ownership, strive to increase sales by offering outstanding service and merchandising . . . . We believe that our DSD distribution system is a significant competitive advantage." The Company misleadingly stated that its DSD system was "designed to provide retail and foodservice customers with superior service," when in fact the system was primarily designed as a "labor strategy" to reduce labor costs.

118.   Despite repeatedly touting the advantages offered by its DSD system, the Individual Defendants misleadingly omitted any serious discussion of the existential risks that distributor misclassification presented to the Company's business and prospects, including that total liability could exceed $1 billion in lost wages, benefits, penalties, fines, and other damages. The Individual Defendants failed to adequately disclose risks faced by its distributor misclassification, and failed to even mention the DOL despite listing a laundry list of federal government agencies that the Company's operations were subject to regulation by:

As a producer and marketer of food items, our operations are subject to regulation by various federal governmental agencies, including the Food and Drug Administration, the Department of Agriculture, the Federal Trade Commission, the Environmental Protection Agency, and the Department of Commerce. We also are subject to the regulations of various state agencies, with respect to production processes, product quality, packaging, labeling, storage, distribution and local regulations regarding the licensing of plants and the enforcement of state standards and facility inspections. Under various statutes and regulations, these

federal and state agencies prescribe requirements and establish standards for quality, purity, and labeling. Failure to comply with one or more regulatory requirements can result in a variety of sanctions, including monetary fines or compulsory withdrawal of products from store shelves.

119.    The Company's Fiscal 2012 10-K also touted its DSD model's ability to "accelerate penetration" of its brands in the Northeast as a result of its Lepage and Tasty acquisitions. These statements were misleading because the Company did not mention the misclassification risks its DSD model presented in the Northeast.

120.    Regarding the Company's SD&A expenses in light of its Lepage acquisition, the Fiscal 2012 10-K discussed the Company's ongoing efforts to convert Lepage's distributor employees to independent contractors:

> Distributor distribution fees decreased as a percent of sales due to the Lepage acquisition. Lepage generally distributes its products directly rather than via independent distributors. We do not expect this to continue once we sell the Lepage territories to independent distributors in and beyond 2013. Once the distributor territories are sold the Lepage distributor distribution fees will be reflected here. Currently, the delivery costs for Lepage are recorded in the selling, distribution and administrative expenses line item as workforce-related costs because their delivery routes are generally all company owned and the employees who deliver their products are included in the workforce-related costs line item.

121.    The Company also described at length its agreements with distributors, including the credit risks associated with leasing trucks, without disclosing the misclassification risks those agreements presented. In addition, the Individual Defendants misrepresented that it did not view the aggregate of $118.5 million in independent distributor notes that could potentially be charged to the Company's earnings as a "concentrated credit risk" because "each note relates to an individual distributor":

> *Distributor Arrangements*.    The company offers long-term financing to independent distributors for the purchase of their territories, and a vast majority of the independent distributors elect to use this financing alternative. The distributor notes generally have terms of up to ten years, and the distributors pay principal and interest weekly. A majority of the independent distributors have the right to require the company to repurchase the territories and trucks, if applicable, at the

original price paid by the distributor on the long-term financing arrangement in the six-month period following the sale of a territory to the independent distributor. If the truck is leased, the company will assume the lease payment if the territory is repurchased during the first six-month period. If the company had been required to repurchase these territories, the company would have been obligated to pay $0.7 million and $0.8 million as of December 29, 2012 and December 31, 2011, respectively. After the six-month period expires, the company retains a right of first refusal to repurchase these territories. Additionally, *in the event the company* exits a territory or *ceases to utilize the independent distribution form of doing business, the company is contractually required to purchase the territory from the independent distributor for ten times average weekly branded sales.* If the company acquires a territory from an independent distributor that is to be resold, the company operates the territory until it can be resold. *If the territory is not to be resold, the value of the territory is charged to earnings. The company held an aggregate of $118.5 million and $117.1 million as of December 29, 2012 and December 31, 2011, respectively, of distributor notes. The company does not view this aggregate amount as a concentrated credit risk, as each note relates to an individual distributor.* The company has approximately $30.1 million and $12.7 million as of December 29, 2012 and December 31, 2011, respectively, of territories held for sale. The increase was primarily the result of higher turnover for expansion market distributor territories, certain routes that were repurchased for route restructuring, and the territories held for sale from the Lepage acquisition of $16.2 million. We anticipate selling these territories in the Lepage distribution area in the near future.

In the ordinary course of business, when an independent distributor terminates its relationship with the company, the company, although not legally obligated, generally purchases and operates that territory utilizing the leased truck of the former distributor. To accomplish this, the company operates the leased truck for the distributor, who generally remains solely liable under the original truck lease to the third-party lessor, and continues the payments on behalf of the former distributor. Once the territory is resold to an independent distributor, the truck lease is assumed by the new independent distributor. At December 29, 2012 and December 31, 2011, the company operated 267 and 217 trucks at held for sale distributorships, respectively. Assuming the company does not resell these territories to new independent distributors, at December 29, 2012 and December 31, 2011, the maximum obligation associated with these truck leases was approximately $10.0 million and $8.7 million, respectively. There is no liability recorded in the consolidated financial statements with respect to such leases, as the obligation for each lease generally remains an obligation of the former distributor until the territory is sold to a new distributor. The company does not anticipate operating these territories over the life of the lease as it intends to resell these territories to new independent distributors.

122.    These statements were misleading because the Company did consider the aggregated amount of the notes as a concentrated credit risk.

123.    Moreover, Flowers' Fiscal 2012 Form 10-K contained certifications pursuant to SOX signed by defendants Deese, Kinsey, and Lauder stating they had reviewed the Fiscal 2012 Form 10-K and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

124.    Further, defendants Deese, Kinsey, and Lauder each signed SOX certifications that the Fiscal 2012 Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

125.    Defendant Kinsey also delivered prepared remarks, and touted the Company's ability to leverage sales growth while containing costs:

> So you can see the importance of acquisitions to the continued growth of Flowers Foods. Our EBITDA growth is all about leveraging the revenue growth. Over time, and you've seen this through our EBITDA margin percentage as a percent of sales, we have been able to the leverage the sales growth by keeping a disciplined approach to cost management when it comes to selling, distribution and administrative expenses. And we do this by staying focused on the most efficient and effective ways to produce and take our products to market. . . . Though our gross margin has been under pressure over the last 5 years, again, we have seen improvement in our SG&A [ph] expenses as a percent of sales.

Defendant Kinsey later concluded his prepared remarks by stating, "[W]e are focused on executing what we believe is a clearly defined growth strategy and it's growth from our core markets and growth from our acquisitions. This growth provides us with strong cash flows that, in turn, does give us confidence to continue to move forward with these strategies."

**2.    First Quarter 2013 Results**

126.    On May 16, 2013, the Individual Defendants announced the Company's first quarter 2013 financial results. The press release, which was filed with the SEC on Form 8-K, touted "the best performance in the company's history." Sales increased 25.9% to $1.13 billion; diluted EPS, excluding certain benefit/costs, was $0.46, up 64.3% from first quarter 2012. The Company recorded a benefit of $0.37 per diluted share related to a bargain purchase accounting gain on the *Sara Lee*/California acquisition and acquisition-related costs of $0.02 per diluted share. Including the benefit and costs, diluted EPS was $0.81.

127.    Commenting on the results, Defendant Deese credited the results to the Company's "investments in our bakeries and our distribution systems over several decades, combined with the strength and determination of our team, [which] allowed us to take on new business and meet the needs of existing and new customers."

128.    The press release also discussed the Company's gross margins and selling, distribution, and administrative costs:

> Gross margin as a percentage of sales for the quarter was 48.2%, up 150 basis points from 46.7% in the first quarter of 2012. This increase was due primarily to higher sales volumes and decreased workforce-related costs as a percent of sales.

> Selling, distribution, and administrative costs as a percent of sales for the quarter were 36.4%, down 40 basis points from 36.8% of sales in the first quarter of fiscal 2012. Higher sales volumes and lower workforce-related costs as a percent of sales were the main drivers of the decrease. Acquisition-related costs negatively impacted selling, distribution, and administrative costs by $4.5 million, or 40 basis points as a percent of sales, in the first quarter of this year.

129.    Notably, the May 16, 2013 press release and Form 10-Q failed to discuss or disclose the U.S. District Court for the Western District of North Carolina's March 22, 2013 Order in the *Rehberg* Action granting conditional certification of plaintiffs' claims under § 216(b) of the FLSA for a class defined as "all those employees who are or were working as distributors for defendants at any time from September 12, 2009 to the entry of this order." At

the time that it granted conditional certification, the court found that plaintiffs had shown that the putative class members were together the probable victims of a single decision, policy or plan and were similarly situated in that: (i) plaintiffs had the same job duties; and (ii) were subject to the same policies and standards determining their compensation and performance requirements.

130.    The Company's first quarter 2013 Form 10-Q, also filed on May 16, 2013, instead repeated the Company's previous generic and misleading warning that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service providers . . . ." This warning misleadingly placed the Company's independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

131.    Flowers' first quarter 2013 Form 10-Q incorporated by reference the same risk factors as the Company's Form 10-K for the year ended December 29, 2012, and stated, "[t]here have been no changes to our risk factors during the first quarter of fiscal 2013."

132.    Moreover, the first quarter 2013 Form 10-Q also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

133.    On May 22, 2013, the Company hosted its Annual Meeting of Flowers Foods Shareholders. In prepared remarks, both Deese and Shiver reiterated that the Company's philosophy would not be changing with the succession of Shiver as CEO. Shiver acknowledged that the Company "promote[s] from within when possible, and that gives us continuity of philosophy throughout the company."

134.    As a result of Defendants' positive statements concerning the Company's continued success and robust growth, Flowers' stock maintained its artificial inflation.

### 3.    Second Quarter 2013 Results

135.    On August 13, 2013, the Individual Defendants announced the Company's second quarter 2013 financial results. The press release, which was filed with the SEC on Form 8-K, touted "another record quarter," including a sales increase of 31.8% to $892.2 million and diluted EPS, excluding acquisition-related costs, of $0.24, up 71.4% from first quarter 2012.

136.    Commenting on the results, Defendant Shiver accredited the results to the Company's "long-term investments in our bakeries, distribution systems, and our team . . . ." Regarding gross margin and selling, distribution, and administrative costs, the release stated:

> Gross margin as a percentage of sales for the quarter was 47.5%, up 120 basis points from 46.3% in the second quarter of 2012. This increase was due primarily to higher sales volumes and decreased ingredient and workforce-related costs as a percent of sales, partially offset by increased outside purchases as a percent of sales.
>
> Selling, distribution, and administrative costs as a percent of sales for the quarter were 36.3%, up 20 basis points from 36.1% of sales in the second quarter of fiscal 2012. Acquisition-related costs negatively impacted selling, distribution, and administrative costs by $5.7 million, or 60 basis points as a percent of sales in the second quarter of this year, and $2.3 million, or 30 basis points as a percent of sales in the second quarter last year.

137.   The Company's second quarter 2013 Form 10-Q filed with the SEC on August 13, 2013, updated investors regarding the Company's efforts to convert the employees of its acquisitions into independent contractors:

> Sales from the Sara Lee and Earthgrains acquisition during the twelve and twenty-eight weeks ended July 13, 2013 were $23.7 million and $34.4 million, respectively. We incurred $1.5 million in acquisition-related costs during the twenty-eight weeks ended July 13, 2013. These expenses are included in the selling, distribution and administrative line item in the company's condensed consolidated statement of income. Since the acquisition date, we developed distribution territories to sell to independent distributors who serve California. The territory development took place in several phases in the first two quarters of fiscal 2013. Because of our decision to develop and market these territories, the distribution rights intangible asset was recharacterized to territories held for sale immediately after the acquisition. The distributor routes caused the significant increase in the assets held for sale as reported on the condensed consolidated balance sheet.

138.   The Company's second quarter 2013 Form 10-Q repeated the Company's previous generic and misleading warning that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service providers . . . ." This warning misleadingly placed the Company's independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

139.   Flowers' second quarter 2013 Form 10-Q incorporated by reference the same risk factors as the Company's Form 10-K for the year ended December 29, 2012, and stated, "[t]here have been no changes to our risk factors during the first and second quarters of fiscal 2013."

140.   The "Litigation" section of the Company's second quarter 2013 Form 10-Q failed to disclose or discuss any of the Company's ongoing misclassification litigation, including the *Rehberg* Action in which a national class of distributors seeking relief for being misclassified as

independent contractors had been conditionally certified on March 22, 2013, as discussed above. Instead, the second quarter 2013 Form 10-Q falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws, stating:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

141.    On the August 13, 2013 conference call discussing the Company's second quarter 2013 results, Defendant Shiver provided prepared remarks that glowingly praised the Company's "outstanding" second quarter results, including a 31.8% increase in sales, "another record performance for our team," and "significantly above" the Company's goal for 5% to 10% annual growth. Adjusted earnings per share growth of 71.4% for the quarter showed the Company's "strong performance in these exceptional times for our industry." The Company's adjusted EBITDA margin was 11.8%, in line with the Company's goal of between 11% and 13%.

142.    Defendant Shiver, in prepared remarks, touted the Company's DSD distribution system:

> We believe that direct-store-delivery, or DSD, is the most effective distribution system for fresh snack cakes as it is for fresh breads and rolls. Tastykake is distributed throughout our DSD system, which serves about 3/4 of the U.S. population. Our distributors are in the stores daily and providing the best possible service to our customers.

143.    In response to a question from an analyst with BB&T Capital Markets regarding Tastykake's growth in light of the reentry of Hostess products into the market, Shiver touted the "strength" of the Company's distribution model: "Now Brett, we -- when you have a competitor

reenter the marketplace, you're always kind of playing on your toes. But I will say that we were confident that we'd be able to hold on to our Tastykake business as Hostess reenter the marketplace. And again, the primary reason for that is the strength of our DSD network."

144.    In response to a question regarding a lack of margin improvement despite consolidation in the ready-to-eat cereal category, Shiver commented on how the Company's independent distributor model "fit[] very well" with the Company's strategy of being the low-cost producer:

> So step 1 is really making sure that our bakeries continue with our strategy of being the low-cost producer, that's the starting point. And we feel like that our model positions us, over the long haul, to improve margins. Our independent distributor model on the sale side, complementing of our DSD business with our Warehouse segment, also fits very well. So we're optimistic about growing the top line and, at the same time, keeping the focus on lowering our cost to make sure we continue to be a low-cost producer.

145.    On September 3, 2013, the Company conducted an investor presentation at the Barclays Back to School Conference in Boston, Massachusetts ("September 3, 2013 Investor Presentation"). A copy of the presentation slides used by the Company at the conference was filed that day with the SEC attached to a Form 8-K incorporated therein by reference.

146.    The September 3, 2013 Investor Presentation slides touted the Company's strong earnings growth attributable to acquisitions, control of labor costs, and omitted the risks presented by Flowers failing to classify its distributors as employees. In a slide entitled "Creating Shareholder Value," the Company boasted its 78% increase in market capitalization from August 29, 2008 to August 29, 2013, as well as its $397.3 million in dividends and $172.8 million in share repurchases during the same period. In a slide entitled, "First Half 2013," the Company touted its 28.4% increase in sales, 51.2% increase in EBITDA, 68.1% increase in EBIT, and 63.6% increase in EPS (excluding bargain purchase accounting gain and acquisition-related costs).

147.   As a result of Defendants' positive statements concerning the Company's continued success and robust growth, Flowers' stock maintained its artificial inflation.

### 4.   <u>Third Quarter 2013 Results</u>

148.   Flowers' third quarter 2013 results were released on November 7, 2013 via press release entitled, "Flowers Foods Reports Third Quarter 2013 Results and Updated Full-Year Guidance" and by quarterly report on Form 10-Q, with both filed with the SEC that day.  The press release touted "another quarter of robust sales growth." In the press release, Defendant Shiver commented on the DSD Segment's results, stating, "The DSD segment achieved exceptional sales growth for our fresh breads, buns, rolls, and snack cakes and delivered operating earnings in line with our expectations." Sales increased 22.5% to $878.5 million compared to $717.3 million in 2012's third quarter Net income for the quarter was $33.9 million, or $0.16 per diluted share, compared to $31.2 million or $0.15 per diluted share during the third quarter of 2012. Gross margin (excluding depreciation and amortization) as a percent of sales was 46.7%, or flat compared to the third quarter of 2012.

149.   The Company's third quarter 2013 Form 10-Q updated investors regarding the Company's efforts to convert the employees of its acquisitions into independent contractors:

> Sales from the Sara Lee and Earthgrains acquisition during the twelve and forty weeks ended October 5, 2013 were $25.4 million and $59.8 million, respectively. We incurred $1.5 million in acquisition-related costs during the forty weeks ended October 5, 2013. These expenses are included in the selling, distribution and administrative line item in the company's condensed consolidated statement of income. Since the acquisition date, we developed distribution territories to sell to independent distributors who serve California. The territory development took place in several phases in the first two quarters of fiscal 2013. Because of our decision to develop and market these territories, the distribution rights intangible asset was recharacterized to territories held for sale immediately after the acquisition.

\*   \*   \*

The $25.8 million distribution rights intangible asset acquired in the Sara Lee California transaction were recorded to assets held for sale immediately subsequent to acquisition because we decided to disaggregate the distribution rights in California into the independent distributor model we use to deliver our products.

*   *   *

The increase in workforce-related costs was primarily attributable to the Lepage and Sara Lee California acquisitions because they generally did not use independent distributors to deliver product for the majority of 2013. We are transitioning both the Lepage and the Sara Lee California operations to the independent distributor model which will, over time, decrease the workforce-related costs and increase the distributor distribution fees.

*   *   *

The overall decrease in selling, distribution and administrative expenses was primarily driven by decreases in distribution costs. These costs were lower because of higher sales volumes which spread the costs over a larger base. These decreases were partially offset by increased broker commissions due to increased sales volume. Higher sales that spread fixed costs over the larger sales base drove the decrease in the other line item component.

150.    The Company's third quarter 2013 Form 10-Q repeated the Company's previous generic and misleading warning that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service providers . . . ." This warning misleadingly placed the Company's independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

151.    Flowers' third quarter 2013 Form 10-Q incorporated by reference the same risk factors as the Company's Form 10-K for the year ended December 29, 2012, and stated, "[t]here have been no changes to our risk factors during the first, second, and third quarters of fiscal 2013."

152.    The "Litigation" section of the Company's third quarter 2013 Form 10-Q failed to disclose or discuss any of the Company's ongoing misclassification litigation, including the *Rehberg* Action in which a national class of distributors seeking relief for being misclassified as independent contractors had been conditionally certified on March 22, 2013, as discussed above. Instead, the Company falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws, stating:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, ***it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.*** However, adverse developments could negatively impact earnings in a particular future fiscal period.

153.    On the November 7, 2013 conference call discussing the Company's third quarter 2013 results, Defendant Shiver delivered prepared remarks that glowingly praised the Company's "tak[ing] advantage of growth opportunities." Shiver touted the Company's increases in sales and earnings per share.

154.    Shiver in particular highlighted the performance of the Company's DSD Segment:

> It's important to point out that our direct-store-delivery segment, which is 83% of sales, performed very well in the quarter. Sales for our fresh breads, rolls and snack cakes were up 23.2%, and we continue to be very pleased with how our DSD team has responded to the market's needs. Operating margin for DSD was strong, even as the segment absorbed the carrying cost of the Hostess assets we acquired.

155.    Defendant Shiver, in further prepared remarks, touted the Company's creation of a statewide distributor network in California: "This year, we acquired $140 million in sales as part of the Sara Lee/California acquisition, and our team created a statewide distributor network to serve customers." In response to analyst questions, Shiver also added:

I think the big news in California is that our team has done a great job putting our independent distributor program in place. And now, we have DSD ability to serve all of the supermarkets in the state. And again, that position's due to really start growing as we move forward. So a big part of what's happened in California has been the putting the distribution system in place. . . .

As you put new brands in the market, as you enter new markets, until consumers become familiar with those brands, there is a pretty high cost of doing business there, so we will, over time we've entered a tremendous amount of new markets in the last couple of years, so I think over time, we'll be able to leverage the product mix as well. And then workforce-related cost, I think you'll lever that off of sales. I mean we do a pretty good job from a cost perspective there, so I think those will be the main drivers on the COGS wheel.

156.    As a result of the Individual Defendants' positive statements concerning the Company's continued success and robust growth, Flowers' stock maintained its artificial inflation.

### 5.    Fourth Quarter and Fiscal 2013 Results

157.    On February 6, 2014, Defendants issued a press release announcing the Company's fourth quarter and fiscal 2013 results entitled, "Flowers Foods, Inc. Announces Fiscal 2013 Fourth Quarter and Full Year Results." According to the press release, Flowers "[a]chieved record full year sales and earnings" for 2013. The fourth quarter results included a fourth quarter sales increase of 12.6% in 2013, compared to 2012, adjusted income from operations (EBIT) of 6.8% of sales, down 4.4% from the prior year, and an EBITDA margin for the quarter of 10.2%. The fiscal 2013 results included record sales of $3.751 billion, an increase of 23.1%, adjusted EBIT of 8.1% of sales, reflecting a 32.8% increase, adjusted net income of $192.3 million, or $0.91 per diluted share, an increase of 31.9%, and an EBITDA margin for the year of 11.2%.

158.    Regarding the Company's DSD Segment's performance, Defendant Shiver commented in the press release, "The direct-store-delivery (DSD) segment continued to perform

well in the second half as it began to roll out our acquired brands and continued to build our customer base."

159.    On the February 6, 2014 conference call discussing the Company's fourth quarter and fiscal 2013 results, Defendant Shiver delivered prepared remarks that glowingly praised the Company's sales growth, growing market share, growing customer base, and the Company's "DSD system [that] now serves about 140,000 customer locations significantly strengthening our access to new markets."

160.    Shiver further stated that he had "confidence in our ability to continue delivering growth, as we build our share in newer markets, strategically extend our DSD reach, build out opportunities in the strong south market, while taking full of advantage of other growth opportunities." Shiver concluded his prepared remarks by boasting, "In 2013, the experience, dedication and commitment of our Flowers team was demonstrated to the marketplace, as we took full of advantage of the growth opportunities. By any measure, Flowers exceeded all competitors in sales growth and DSD territory expansion."

161.    Defendant Kinsey, in prepared remarks, added:

The gross margin in the quarter was 46.9%, compared to 47.9% of last year's fourth quarter as a percent of sales. The reduction at the percent of sales was primarily related to the carrying costs and the decreased manufacturing efficiencies. The full-year gross margin as a percent of sales was 47.4% compared to 46.9%, up 50 basis points year-over-year. Improvement from the full-year gross margin were driven primarily by stronger sales. As a percent of sales, adjusted selling, distribution and administrative costs in the quarter were 36.7%, compared to 36.4% in last year's fourth quarter. The full-year adjusted selling, distribution and administrative costs as a percent of sales were 36.2%, compared to 36.4% last year. The primarily drivers of this increase were higher workforce costs, and costs associated with market expansions.

162.    The Company's fourth quarter and full year financial results for the fiscal year ended December 28, 2013 were incorporated in its fiscal year 2013 Form 10-K, filed with the SEC on February 19, 2014 ("Fiscal 2013 Form 10-K"). The Fiscal 2013 Form 10-K was signed

by defendants Deese, Kinsey, and Lauder, and reaffirmed the Company's financial results announced in the press release issued on February 7, 2013.

163.    In its Fiscal 2013 Form 10-K, the Company again misleadingly and generically warned investors that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service providers . . . ." This warning misleadingly placed its independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

164.    The Fiscal 2013 Form 10-K discussed the Company's "market expansion efforts . . . driven by our individual bakeries as they extend their service boundaries by serving new customers in territories adjacent to their current service areas." The individual bakeries "accomplish this" in part by "adding our direct-store-distribution structure . . . ." The Company touted this "growth strategy" as "proven successful, evidenced by our sales and net income compound average annual growth rate of 9.2% and 13.9%, respectively, over the last five years."

165.    Flowers also claimed in the Fiscal 2013 Form 10-K that it "strive[s] to maintain good relationships and ongoing communications with all our team members. We are committed to equal employment opportunities, meeting all federal and state employment laws, and striving to respect the dignity of all our team members and associates." In truth, the Company was not committed to meeting all federal and state employment laws, and instead was committed to a "labor strategy" centered on the misclassification of its distributors as independent contractors to save on labor costs, including the payment of overtime wages.

166.    The Fiscal 2013 Form 10-K falsely stated that the Company "employ[ed] approximately 10,500 people." In truth, the Company at the time employed approximately 15,450 people, a figure that includes the Company's approximately 4,950 distributors the Company was misclassifying as independent contractors at the time.

167.    The Fiscal 2013 Form 10-K also falsely assured, "We believe that we are currently in material compliance with applicable federal, state and local laws and regulations." In truth, the Company knew but did not disclose that it was not in material compliance with federal, state, and local laws and regulations that required its distributors to be classified as employees.

168.    Indeed, the Fiscal 2013 Form 10-K also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

169.    Regarding the duties of its distributors, the Fiscal 2013 Form 10-K acknowledged that these duties included "determining appropriate order levels and delivering products from bakeries to independent distributors for sale and direct delivery to customer stores. Distributors are responsible for ordering products, stocking shelves, maintaining special displays, and visiting customers daily to ensure adequate inventory and removing unsold goods." The Fiscal 2013 Form 10-K also describes the Company's practice of providing hand-held computers to the independent distributors to use for "daily ordering, transactions, and to manage their businesses," and then charging distributors an "administrative fee" for their use, totaling $5.2 million in 2013,

$4.9 million in 2012, and $4.6 million in 2011. The Company acknowledged that this administrative fee "reduces the [C]ompany's selling, distribution and administrative expenses . . . ."

170.    The Fiscal 2013 Form 10-K also touted the Company's ability to closely track inventory and sales using distributors' hand-held computers and proprietary software:

> Our proprietary software permits distributors to track and communicate inventory data to bakeries and to calculate recommended order levels based on historical sales data and recent trends. These orders are electronically transmitted to the appropriate bakery on a nightly basis. This system ensures that distributors have an adequate supply of the right mix of products to meet retail and foodservice customers' immediate needs. We believe this system strives to minimize returns of unsold goods.

> In addition to handheld computers, we maintain an information technology ("IT") platform that allows us to accurately track sales, product returns, and profitability by selling location, bakery, day, and other criteria. The system provides us with daily real time, online access to sales and gross margin reports, allowing us to make prompt operational adjustments when appropriate. It also permits us to forecast sales and improve our in-store product ordering by customer. This IT platform is integral to our hand-held computers.

> We also use PBS [pay-by-scan] to track and monitor sales and inventories more effectively. PBS allows the independent distributors to bypass the often lengthy product check-in at retail stores, which gives them more time to service customers and merchandise products. PBS also benefits retailers, who only pay suppliers for what they actually sell, or what is scanned at checkout. During fiscal 2013 approximately $1,116.4 million of our DSD segment sales came through our PBS system.

171.    In its Fiscal 2013 Form 10-K, the Company repeatedly touted the benefits of classifying its distributors as independent contractors: "Independent distributors, highly motivated by financial incentives from their territory ownership, strive to increase sales by offering outstanding service and merchandising. . . . We believe that our DSD distribution system is a significant competitive advantage." The Individual Defendants caused the Company to misleadingly state that its DSD system was "designed to provide retail and foodservice

customers with superior service," when in fact the system was primarily designed as a "labor strategy" to reduce labor costs.

172.   Despite repeatedly touting the advantages offered by its DSD system, the Individual Defendants misleadingly omitted any serious discussion of the existential risks that distributor misclassification presented to the Company's business and prospects, including that total liability could exceed $1 billion in lost wages, benefits, penalties, fines and other damages and that the Company could be forced to jettison its entire DSD model. The Individual Defendants failed to adequately disclose risks faced by the Company's distributor misclassification, and failed to even mention the DOL despite disclosing a laundry list of federal government agencies that the Company's operations were subject to regulation by:

> As a producer and marketer of food items, our operations are subject to regulation by various federal governmental agencies, including the Food and Drug Administration, the Department of Agriculture, the Federal Trade Commission, the Environmental Protection Agency, and the Department of Commerce. We also are subject to the regulations of various state agencies, with respect to production processes, product quality, packaging, labeling, storage, distribution and local regulations regarding the licensing of plants and the enforcement of state standards and facility inspections. Under various statutes and regulations, these federal and state agencies prescribe requirements and establish standards for quality, purity, and labeling. Failure to comply with one or more regulatory requirements can result in a variety of sanctions, including monetary fines or compulsory withdrawal of products from store shelves.

173.   Indeed, any purported risk warnings provided in the Fiscal 2013 Form 10-K were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking." For example, although the Company warned, "Increases in employee and employee-related costs could have adverse effects on our profitability," this warning was misleading in light of the Company's other representations in the Fiscal 2013 10-K that its approximately 4,950 distributors should not be considered employees. Similarly, the Company's purported warnings that: (i) "Any substantial

increase in pension, health care or workers' compensation costs may have an adverse impact on our profitability"; (ii) "In addition, legislation or regulations involving labor and employment and employee benefit plans (including employee health care benefits and costs) may impact our operational results"; and (iii) "A material negative change in our relationship with the independent distributors, an adverse ruling by regulatory or governmental bodies regarding our independent distributorship program or an adverse judgment against the company for actions taken by the independent distributors could materially affect our financial condition, results of operations, and cash flows," were also misleading in light of the Company's failure to classify its approximately 4,950 distributors as Company employees.

174.    The Company's Fiscal 2013 10-K also touted its DSD model's ability to "accelerate penetration" of its brands in the Northeast as a result of its Lepage and Tastykake acquisitions. These statements were misleading because the Company did not mention the misclassification risks its DSD model presented in the Northeast.

175.    Regarding the Company's SD&A expenses in light of its Lepage acquisition, the Company discussed in its Fiscal 2013 Form 10-K its ongoing efforts to convert Lepage's distributor employees to independent contractors:

> Distributor distribution fees decreased as a percent of sales due to the Lepage acquisition. Lepage generally distributes its products directly rather than via independent distributors. We do not expect this to continue as we began selling the Lepage territories to independent distributors in 2013 and will continue to do so in 2014. Once the distributor territories are sold the Lepage distributor distribution fees will be reflected here. Currently, the delivery costs for Lepage are recorded in the selling, distribution and administrative expenses line item as workforce-related costs because their delivery routes are generally all company owned and the employees who deliver their products are included in the workforce-related costs line item.

176.    The Individual Defendants also described at length the Company's agreements with distributors, including the credit risks associated with leasing trucks, without disclosing the

misclassification risks those agreements presented. In addition, Defendants misrepresented that it did not view the aggregate of $161.6 million in independent distributor notes as of December 28, 2013, that could potentially be charged to the Company's earnings as a "concentrated credit risk" because "each note relates to an individual distributor":

> *Distributor Arrangements*.   The company offers long-term financing to independent distributors for the purchase of their territories, and a vast majority of the independent distributors elect to use this financing alternative. The distributor notes generally have terms of up to ten years, and the distributors pay principal and interest weekly. A majority of the independent distributors have the right to require the company to repurchase the territories and trucks, if applicable, at the original price paid by the distributor on the long-term financing arrangement in the six-month period following the sale of a territory to the independent distributor. If the truck is leased, the company will assume the lease payment if the territory is repurchased during the first six-month period. If the company had been required to repurchase these territories, the company would have been obligated to pay $0.7 million and $0.7 million as of December 28, 2013 and December 29, 2012, respectively. After the six-month period expires, the company retains a right of first refusal to repurchase these territories. Additionally, ***in the event the company*** exits a territory or ***ceases to utilize the independent distribution form of doing business, the company is contractually required to purchase the territory from the independent distributor.*** If the company acquires a territory from an independent distributor that is to be resold, the company operates the territory until it can be resold. ***If the territory is not to be resold, the value of the territory is charged to earnings. The company held an aggregate of $161.6 million and $118.5 million as of December 28, 2013 and December 29, 2012, respectively, of distributor notes. This increase is a result of territories sold during fiscal 2013 and financed by the company, primarily those territories located in California and related to the Lepage acquisition. The company does not view this aggregate amount as a concentrated credit risk, as each note relates to an individual distributor.*** The company has approximately $26.6 million and $30.1 million as of December 28, 2013 and December 29, 2012, respectively, of territories held for sale. The decrease was primarily the result of certain routes that were repurchased for route restructuring in fiscal 2012 and which were sold during fiscal 2013.
>
> In the ordinary course of business, when an independent distributor terminates their relationship with the company, the company, although not legally obligated, generally purchases and operates that territory utilizing the leased truck of the former distributor. To accomplish this, the company operates the leased truck for the distributor, who generally remains solely liable under the original truck lease to the third party lessor, and continues the payments on behalf of the former distributor. Once the territory is resold to an independent distributor, the truck lease is assumed by the new independent distributor. At December 28, 2013 and

December 29, 2012, the company operated approximately 370 and 270 trucks as held for sale distributorships, respectively. Assuming the company does not resell these territories to new independent distributors, at December 28, 2013 and December 29, 2012, the maximum obligation associated with these truck leases was approximately $3.9 million and $10.0 million, respectively. There is no liability recorded in the Consolidated Balance Sheet with respect to such leases, as the obligation for each lease generally remains an obligation of the former distributor until the territory is sold to a new distributor. The company does not anticipate operating these territories over the life of the lease as it intends to resell these territories to new independent distributors.

These statements were misleading because the Company *did* consider the aggregated amount of the notes as a concentrated credit risk.

177.    Moreover, Flowers' Fiscal 2013 Form 10-K contained SOX certifications signed by defendants Deese, Kinsey, and Lauder stating they had reviewed the Form 10-K and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

178.    Further, defendants Deese, Kinsey, and Lauder each signed SOX certifications that the Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

179.    As a result of the Individual Defendants' positive statements concerning the Company's continued success and robust growth, Flowers' stock maintained its artificial inflation.

180.    On April 11, 2014 the Individual Defendants caused the Company to file its Definitive Proxy Statement on Schedule 14A with the SEC (the "2014 Proxy Statement").  The

2014 Proxy Statement summarizes the financial results detailed in the Fiscal 2013 Form 10-K and similarly omits and misstates the information detailed therein.

### 6.     First Quarter 2014 Results

181.    Flowers' first quarter 2014 results were released on May 15, 2014 via press release entitled, "Flowers Foods, Inc. Announces First Quarter Fiscal 2014 Results" and by a quarterly report on Form 10-Q filed with the SEC that same day.

182.    Net income at Flowers in the first quarter ended April 19 was $61.1 million, equal to 0.29 per share on the common stock, down 45% from $112.0 million, or 0.53 per share in the first quarter of 2013. Net sales were $1.160 billion, up 2.6% from $1.131 billion a year earlier. Excluding a $50.1 million bargain purchase price gain during the year earlier period, net income in the first quarter of 2014 was down 6%. Gross margin during the quarter was 48.6%, an improvement of 40 basis points from the first quarter of 2013.

183.    "During the quarter, the company's DSD sales increased 5.0%, reflecting volume gains of 2.2%, positive net price/mix of 1.3%, and contributions from the Sara Lee/California acquisition of 1.5%," Flowers said in the press release. "Income from operations for the DSD segment was $96.8 million, or 10.0% of sales for the quarter compared to $101.4 million, or 11.0% of sales in last year's first quarter, excluding the bargain purchase accounting gain."

184.    Defendant Shiver stated in the press release, "The DSD segment delivered solid sales growth and operating results, despite added costs associated with the Hostess acquisition, start-up of added production capacity, and new market expansion."

185.    Flowers' first quarter 2014 Form 10-Q incorporated by reference the same risk factors as the Company's Form 10-K for the year ended December 28, 2013, and stated, "[t]here have been no changes to our risk factors during the first quarter of fiscal 2014."

186.     Additionally, the first quarter 2014 Form 10-Q falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

187.     During the conference call with investors to discuss the results, Defendant Shiver stated that from a distribution perspective, Flowers made significant progress gaining shelf space for its acquired brands after the first quarter ended. Asked about DSD routes in California, Mr. Shiver said the Company has made considerable progress, stating, "[W]e now have over 400 routes serving all of the major retailers in California . . . ."

### 7.    Second Quarter 2014 Results

188.     Flowers' second quarter 2014 results were released on August 12, 2014 via press release entitled, "Flowers Foods, Inc. Announces Second Quarter Fiscal 2014 Results; Revises 2014 Guidance" and by a quarterly report on Form 10-Q, both filed with the SEC that day.

189.     Net income at Flowers Foods in the second quarter ended July 12 was $42.1 million, equal to 0.20 per diluted share, down 9% from $46.5 million, or 0.22 per diluted share, in the second quarter of 2013. Sales were $877.4 million, down 2.3% from $898.2 million. Double-digit declines in the Company's snack cake sales were a significant factor in lower second-quarter sales and earnings at Flowers. In the six months ended July 12, 2014, Flowers net income was $103.1 million, or 0.48 per share, down 35% from $158.5 million, or 0.75, in the first half of 2013. Net sales were $2.037 billion.

190.    Updating its financial guidance for 2014, the Company significantly reduced its earnings growth forecast for the full year—to a range of 1.1% to 7.7%. Three months earlier, Flowers had forecast full-year growth of 7.7% to 15.4%. Sales growth for the year was tightened to a range of 3.5% to 5%, from 6% to 10%.

191.    Despite the Individual Defendants optimism that Flowers would "weather the reintroduction very well" of Hostess products in July 2013, less than a year later most of Flowers' market share gains had been lost.

192.    Commenting on the second quarter during the conference call, Defendant Kinsey said that Flowers' cake sales overall were down 12%, including a drop of about 11% in the Company's DSD business and 13% in warehouse business.

193.    Nonetheless, during the conference call, Defendant Shiver reassured investors that "Our strategy is solid. We will grow our Tastykake brand as we leverage the distribution strength of our DSD route structure by offering outstanding customer service and exceptional product quality."

194.    During the conference call, Defendant Shiver said Flowers was "working very hard to regain" the off rack displays and predicted the Flowers DSD distribution model will prove to be a meaningful competitive advantage, versus warehouse delivery system employed at Hostess. According to Defendant Shivers: "So it is really a function of the news of Hostess coming back. They did a good job getting distribution. And now I think our strength—our DSD strength over the long term—will prove out."

195.    Flowers' second quarter 2014 Form 10-Q incorporated by reference the same risk factors stated in the Company's Form 10-K for the year ended December 28, 2013, and stated,

"[t]here have been no changes to our risk factors during the twenty-eight weeks ended July 12, 2014."

196.    Moreover, the second quarter 2014 Form 10-Q also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

197.    On August 12, 2014, Flowers Foods shares slumped as much as 7.5% in early trading, before settling for the day at $19.10, down 0.91, or 4.6%.

### 8.      Third Quarter 2014 Results

198.    Flowers' third quarter 2014 results were released on November 12, 2014 via press release entitled, "Flowers Foods Announces Third Quarter Fiscal 2014 Results; Revises 2014 Guidance" and by a quarterly report on Form 10-Q, both filed with the SEC that day.

199.    Net income of Flowers Foods in the third quarter ended October 4, 2014 was $44.4 million, equal to 0.21 per share on the common stock, up 16% from $38.4 million, or 0.18 per share, in the third quarter of 2013. Net sales were $849.4 million, down 3.3% from $878.5 million. Flowers' cake sales were down 8.3%, including a decline of about 7% in the Company's direct-store delivery business and 10% in the Company's warehouse business.

200.    For the second straight quarter, the Individual Defendants caused Flowers to issue a downward revision in its sales and earnings guidance for fiscal 2014. With the revisions, sales during the year were expected to possibly be lower than in 2013, and earnings were expected to

be down. Flowers revised its guidance for 2014 sales to a range of $3.75 billion to $3.77 billion. During second quarter 2014, Flowers was forecasting full-year sales of $3.88 to $3.94 billion and a quarter before that the range was $3.976 billion to $4.126. Now, at the low end of its latest guidance, Flowers was predicting sales that would be slightly down compared with $3,751,005,000 in 2013. Its initial guidance had forecast sales growth of 6% to 10%.

201.    Earnings per share guidance was revised downward to $0.86 to $0.90 per share, versus the $0.92 to $0.98 the Company projected for the full year a quarter earlier and $0.98 to $1.05 forecast initially and affirmed after the first quarter. Even at the high end of the Company's latest forecast for 2014, adjusted earnings per share would fall shy of 2013 profits, which were $0.91 per share.

202.    Nonetheless, during the November 12, 2014 conference call with analysts following the results, Defendant Shiver stated he had "never been more optimistic" about growth prospects for the Company's Tastykake brand. Defendant Shiver said the Company already has seen evidence that Flowers' DSD network offers competitive advantages producing results. Similarly, during the call he stated, "Our DSD network allows us to work directly with store managers to make sure our products are effectively merchandised to attract those important impulse purchases of snack cake." "Single-serve Tastykakes are doing exceptionally well," he said. "It really works well with our independent distributor model, because in many cases there are incremental sales that can certainly help their business as well as ours."

203.    Flowers' third quarter 2014 Form 10-Q filed with the SEC incorporated by reference the same risk factors stated in the Company's Form 10-K for the year ended December 28, 2013, and stated "[t]here have been no changes to our risk factors during the forty weeks ended October 4, 2014."

204.    Moreover, the third quarter 2014 Form 10-Q also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

### 9.    Fourth Quarter and Fiscal 2014 Results

205.    On February 12, 2015, Flowers issued a press release entitled, "Flowers Foods, Inc. Announces Results for the Fourth Quarter & Full Year 2014."

206.    The press release announced the Company had increased the annual dividend rate by 10.5% to $0.53 per share. The Company also announced that it had increased its share repurchase authorization by 7.1 million shares to 74.6 million shares.

207.    Net income of Flowers in the year ended January 3 was $175,739,000, equal to $0.82 per share on the common stock, down 24% from $230,894,000, or $1.09 per share, in 2013. Sales were $3,748,973,000, up 0.4% from $3,732,616,000 the prior year.

208.    According to the press release, Flowers "[a]chieved record full year sales and earnings" for 2013. The fourth quarter results included a fourth quarter sales increase of 12.6% in 2013, compared to 2012, adjusted income from operations (EBIT) of 6.8% of sales, down 4.4% from the prior year, and an EBITDA margin for the quarter of 10.2%. The fiscal 2013 results included record sales of $3.751 billion, an increase of 23.1%, adjusted EBIT of 8.1% of sales, reflecting a 32.8% increase, adjusted net income of $192.3 million, or $0.91 per diluted share, an increase of 31.9%, and an EBITDA margin for the year of 11.2%.

209.    During a February 12, 2015 conference call after the results were announced, Defendant Shiver commented on the Company's distribution network, stating, "Currently our distribution network has access to over 80% of the U.S. population and we have substantial opportunity to grow share in our expansion markets. . . . Additionally, we have increased distribution on the east and on the west coast where sales growth we expect in those large markets will be supported by the capacity that we have recently added in those regions."

210.    The adjusted earnings figure for 2014 was on the high side of the Company's most recent guidance, which ranged from $0.86 to $0.90 per share but fell well shy of the Company's initial guidance earlier in the year of $0.98 to $1.05. The sales figure for the year was just beneath the most recent guidance of $3,750 million to $3,770 million. As recently as May 2014, the Company was projecting sales in a range of $3.976 billion to $4,126 billion.

211.    In an analyst report dated February 12, 2015, Pivotal Research Group commented on the Company's history of missed guidance: "The company is optimistic and has a pattern of introducing aggressive guidance and then calling it down as the year progresses."

212.    On February 25, 2015, Flowers filed its Annual Report with the SEC on Form 10-K for the fiscal year ended January 3, 2015 ("Fiscal 2014 Form 10-K"). The Company's Fiscal 2014 Form 10-K was signed by defendants Shiver, Kinsey, and Lauder, and reaffirmed the Company's financial results announced in the press release issued on February 12, 2015.

213.    In its Fiscal 2014 Form 10-K, the Company misleadingly and generically warned investors that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, independent distributors and third party service

providers . . . ." This warning misleadingly placed its independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors.

214.   The Individual Defendants also caused Flowers to claim in the Fiscal 2014 Form 10-K that it "strive[s] to maintain good relationships and ongoing communications with all our team members. We are committed to equal employment opportunities, meeting all federal and state employment laws, and striving to respect the dignity of all our team members and associates." In truth, the Company was not committed to meeting all federal and state employment laws, and instead was committed to a "labor strategy" centered on the misclassification of its distributors as independent contractors to save on labor costs, including the payment of overtime wages.

215.   The Fiscal 2014 Form 10-K falsely stated that the Company "employ[ed] approximately 10,380 people. Approximately 1,060 of these employees are covered by collective bargaining agreements. We believe that we have good relations with our employees." In truth, the Company at the time employed approximately 15,580 people, a figure including the Company's approximately 5,200 distributors the Company was misclassifying as independent contractors at the time.

216.   The Fiscal 2014 Form 10-K also falsely assured, "We believe that we are currently in material compliance with applicable federal, state and local laws and regulations." In truth, the Individual Defendants knew but did not disclose that the Company was not in material compliance with federal, state, and local laws and regulations that required its distributors to be classified as employees.

217.    Moreover, the Fiscal 2014 Form 10-K also falsely assured that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

218.    Additionally in its Fiscal 2014 Form 10-K, the Individual Defendants Company touted the benefits of classifying the Company's distributors as independent contractors: "Independent distributors, highly motivated by financial incentives from their territory ownership, strive to increase sales by offering outstanding service and merchandising. . . . We believe that our DSD distribution system is a significant competitive advantage." The Company misleadingly stated that its DSD system was "designed to provide retail and foodservice customers with superior service," when in fact the system was primarily designed as a "labor strategy" to reduce labor costs.

219.    Despite repeatedly touting the advantages offered by its DSD system, the Individual Defendants misleadingly omitted any serious discussion of the existential risks that distributor misclassification presented to the Company's business and prospects, including total liability could exceed $1 billion in lost wages, benefits, penalties, fines, and other damages. The Individual Defendants failed to adequately disclose risks faced by the Company's distributor misclassification, and failed to even mention the DOL despite listing a laundry list of federal government agencies that the Company's operations were subject to regulation by:

> As a producer and marketer of food items, our operations are subject to regulation by various federal governmental agencies, including the Food and Drug

Administration, the Department of Agriculture, the Federal Trade Commission, the Environmental Protection Agency, and the Department of Commerce. We also are subject to the regulations of various state agencies, with respect to production processes, product quality, packaging, labeling, storage, distribution and local regulations regarding the licensing of plants and the enforcement of state standards and facility inspections. Under various statutes and regulations, these federal and state agencies prescribe requirements and establish standards for quality, purity, and labeling. Failure to comply with one or more regulatory requirements could result in a variety of sanctions, including monetary fines or compulsory withdrawal of products from store shelves.

220.    The Company also described at length in its Fiscal 2014 Form 10-K its agreements with distributors, including the credit risks associated with leasing trucks, without disclosing the misclassification risks those agreements presented. In addition, the Individual Defendants misrepresented that it did not view the aggregate of $182.2 million in independent distributor notes that could potentially be charged to the Company's earnings as a "concentrated credit risk" because "each note relates to an individual distributor":

> *Distributor Arrangements.* The company offers long-term financing to independent distributors for the purchase of their territories, and a vast majority of the independent distributors elect to use this financing alternative. The distributor notes generally have terms of up to ten years, and the distributors pay principal and interest weekly. A majority of the independent distributors have the right to require the company to repurchase the territories and trucks, if applicable, at the original price paid by the distributor on the long-term financing arrangement in the six-month period following the sale of a territory to the independent distributor. If the truck is leased, the company will assume the lease payment if the territory is repurchased during the first six-month period. After the six-month period expires, the company retains a right of first refusal to repurchase these territories. Additionally, ***in the event the company*** exits a territory or ***ceases to utilize the independent distribution form of doing business, the company is contractually required to purchase the territory from the independent distributor.*** If the company acquires a territory from an independent distributor that is to be resold, the company operates the territory until it can be resold. ***If the territory is not to be resold, the value of the territory is charged to earnings. The company held an aggregate of $182.2 million and $161.6 million as of January 3, 2015 and December 28, 2013, respectively, of distributor notes. The company does not view this aggregate amount as a concentrated credit risk, as each note relates to an individual distributor.*** The company has approximately $20.5 million and $26.6 million as of January 3, 2015 and December 28, 2013, respectively, of territories held for sale.

In the ordinary course of business, when an independent distributor terminates their relationship with the company, the company, although not legally obligated, generally purchases and operates that territory utilizing the leased truck of the former distributor. To accomplish this, the company operates the leased truck for the distributor, who generally remains solely liable under the original truck lease to the third-party lessor, and continues the payments on behalf of the former distributor. Once the territory is resold to an independent distributor, the truck lease is assumed by the new independent distributor. At January 3, 2015 and December 28, 2013, the company operated approximately 420 and 370 trucks as held for sale distributorships, respectively. Assuming the company does not resell these territories to new independent distributors, at January 3, 2015 and December 28, 2013, the maximum obligation associated with these truck leases was approximately $8.1 million and $3.9 million, respectively. There is no liability recorded in the Consolidated Balance Sheet with respect to such leases, as the obligation for each lease generally remains an obligation of the former distributor until the territory is sold to a new distributor. The company does not anticipate operating these territories over the life of the lease as it intends to resell these territories to new independent distributors

221.    These statements were misleading because the Company *did* consider the aggregated amount of the notes as a concentrated credit risk.

222.    On April 24, 2015 the Individual Defendants caused the Company to file its Definitive Proxy Statement on Schedule 14A with the SEC (the "2015 Proxy Statement").  The 2014 Proxy Statement summarizes the financial results detailed in the Fiscal 2014 Form 10-K and similarly omits and misstates the information detailed therein.

### 10.    First Quarter 2015 Results

223.    Before the Company's first quarter 2015 results were released, Pivotal Research Group predicted the Individual Defendants would now disclose the *Rehberg* Action in an analyst report dated May 26, 2015, that discussed why the misclassification issue was important to investors, and provided information from the analysts' personal interviews with Flowers' distributors:

> **BOTTOM LINE**: **Last Thursday Flowers Foods lost its appeal of the certification** of a class-action lawsuit filed on behalf of 200 or so distributors in North Carolina, South Carolina, Virginia, and West Virginia. On March 24th the U.S. District Court for the Western District of North Carolina certified the class

action. FLO appealed the certification of the class; on May 21st the court rejected Flowers' appeal, so the suit will move forward. FLO has not yet disclosed this legal issue but we expect they will in the 1Q10-Q filed later this week. At issue is whether the classification of "independent distributors" as "independent contractors" is correct, or should they more properly be classified as employees. The suit is titled Rehberg et al v. Flowers Foods, Inc. et al.

**For Flowers Foods, the Independent Operator (IO) has been a key operating advantage.** IOs (unlike employee distributors) don't have collective bargaining rights. They are not paid for overtime and they pay their own pensions, healthcare and benefits. The bakery industry is a patchwork of models with employee models mostly in the North and Central states and IOs used for much of the South where right-to-work laws have historically limited the formation of unions. FLO's distributors don't sell, they deliver and merchandise. In the aforementioned class action, Flowers IOs maintain that the relationship they have with the company is effectively an employee relationship rather than the relationship of an independent contractor. If this argument prevails, it would radically alter the costs of distribution for FLO, both from a damages standpoint as well as prospectively, the costs to distribute product.

**We have personally interviewed a number of IOs** and our findings are supportive of the "employee" view of IOs. In this report we will describe, in detail, the financial and working relationship FLO has with its IOs and we will leave it to the reader to decide the level of risk and exposure FLO has to this rapidly-evolving situation. We think the suit mentioned above, another in DC and a third in California are the first of many that may inexorably alter the distributor economics for Flowers.

224.    Flowers' first quarter 2015 results were released on May 28, 2015 via press release entitled, "Flowers Foods, Inc. Announces Results for the First Quarter 2015" and by a quarterly report on Form 10-Q, both filed with the SEC that day.

225.    Net income of Flowers Foods in the first quarter was $61.4 million, or $0.29 per diluted share, up 0.5% from $61.1 million, or $0.29 per diluted share, in the same quarter in fiscal 2014. Net sales were $1.146 million, down 0.7%. Defendant Shiver described the results in the second quarter as evidence of progress toward profitable growth. According to Shiver, sales of higher margin branded and food service products, favorable ingredient costs, and improved manufacturing efficiencies helped widen margins.

226.    In the first quarter 2015 Form 10-Q, Flowers finally disclosed the pending class

action suits filed by distributors alleging misclassification as independent contractors instead of

as employees:

> On September 12, 2012, a complaint was filed in the U.S. District Court for the
> Western District of North Carolina (Charlotte Division) by Scott Rehberg,
> Willard Allen Riley and Mario Ronchetti against the company and its subsidiary,
> Flowers Baking Company of Jamestown, LLC. Plaintiffs are or were distributors
> of our Jamestown subsidiary who contend they were misclassified as independent
> contractors. The action sought class certification on behalf of a class comprised of
> independent distributors of our Jamestown subsidiary who are classified as
> independent contractors. In March 2013, the court conditionally certified the class
> action for claims under the Fair Labor Standards Act ("FLSA"). On March 23,
> 2015, the court re-affirmed its FLSA certification decision and also certified
> claims under state law.
>
> At this time, the company is also aware of four other complaints alleging
> misclassification claims that have been filed in four other jurisdictions. The
> company and/or its respective subsidiaries are vigorously defending these
> lawsuits. Given the stage of the complaints and the claims and issues presented,
> the company cannot reasonably estimate at this time the possible loss or range of
> loss, if any, that may arise from the unresolved lawsuits.

227.    Despite disclosing that the *Rehberg* court had re-affirmed its FLSA certification

decision and certified claims under state law, the Individual Defendants continued to assert that

the misclassification lawsuits would not have a material adverse effect on the Company despite

knowing that its intentional misclassification of distributors violated federal and state laws:

> The company and its subsidiaries from time to time are parties to, or targets of,
> lawsuits, claims, investigations and proceedings, which are being handled and
> defended in the ordinary course of business. While the company is unable to
> predict the outcome of these matters, ***it believes, based upon currently available
> facts, that it is remote that the ultimate resolution of any such pending matters
> will have a material adverse effect on its overall financial condition, results of
> operations or cash flows in the future.*** However, adverse developments could
> negatively impact earnings in a particular future fiscal period.

228.    In its first quarter 2015 Form 10-Q, the Company misleadingly and generically

warned investors that "[c]ertain factors that may cause actual results, performance, liquidity, and

achievements to differ materially from those projected are discussed in this report and may

include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees, and third party service providers."

229.   Despite repeatedly touting the advantages offered by its DSD system, stating "We believe that our DSD distribution system is a significant competitive advantage," the first quarter 2015 10-Q misleadingly omitted any serious discussion of the existential risks that distributor misclassification presented to the Company's business and prospects, including total liability could exceed $1 billion in lost wages, benefits, penalties, fines, and other damages.

230.   These purported risk warnings that may have been provided in the first quarter 2015 10-Q were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking." For example, although the Company warned, "Increases in employee and employee-related costs could have adverse effects on our profitability," this purported warning was misleading in light of the Company's other representations in the first quarter 2015 10-Q that its approximately 5,200 distributors should not be considered employees. Similarly, the Company's purported warnings that (i) "Any substantial increase in pension, health care or workers' compensation costs may have an adverse impact on our profitability"; (ii) "In addition, legislation or regulations involving labor and employment and employee benefit plans (including employee health care benefits and costs) may impact our operational results"; and (iii) "We believe that our DSD distribution system is a significant competitive advantage. A material negative change in our relationship with the independent distributors, litigation or one or more adverse rulings by courts or regulatory or governmental bodies in various jurisdictions regarding our independent distributorship system, including actions or decisions that could affect the independent contractor classifications of our independent distributors, or an adverse judgment against the company for

actions taken by the independent distributors could materially affect our financial condition, results of operations, and cash flows," were also misleading in light of the Company's intentional failure to classify its approximately 5,200 distributors as Company employees.

231.    Flowers reaffirmed sales guidance for fiscal 2015 of $3.786 billion to $3.861 billion and earnings per share of $0.96 of $1.01. In the conference call following the results, Defendant Shiver said that looking beyond 2015, the Company sees "a long runway for growth." "Our independent distributors continue to have great success growing cake sales in their territories," Shiver said.

232.    In the ensuring conference call with analysts discussing the first quarter 2015 results, Shiver touted the success of the Company's DSD model:

> Tastykake, which makes up the majority of our DSD branded cake sales, posted growth this quarter, as our independent distributors continue to have great success, growing cake sales in their territories. Our independent distributors work hard to build relationships with their store managers, and to secure display opportunities.

233.    During prepared remarks and follow-up questions, Kinsey acknowledged that legal expenses were increasing as a percentage of corporate costs, but otherwise misled investors regarding the existential risks the Company faced going forward resulting from its misclassification of distributors by telling investors that the first quarter 2015 Form 10-Q's purported "legal disclosures . . . disclose anything that we will consider material at this point . . .":

> Selling, distribution and administration expenses were 37% of sales for the first quarter, up 60 basis points as a percent of sales compared to last year's 36.4%. The main driver of this increase was increased unallocated corporate costs. Specifically, lower pension income, higher workforce costs and higher legal fees.

> *   *   *

> Legal expenses are harder to predict, but I do expect they could be up and down quarter-to-quarter throughout the year.

*   *   *

Eric Katzman

Okay. And then Steve, in following the company for so many years, I don't really remember you talking about legal costs, as kind of an issue or a volatile component. Is there anything in particular that's going on, that we need to be aware of, or focus on?

Steve Kinsey

Obviously Eric, from a legal perspective, we wouldn't comment specifically on any individual item. The costs were elevated this quarter, for the first time to the magnitude that they jumped. We do have our legal disclosures in our 10Q, so I would say those disclose anything that we will consider material at this point, beyond that I wouldn't want to comment specifically on any one legal item. As for the year, I do expect they could possibly be up and down. In the fourth quarter they were up some.

234.    In an analyst report dated May 28, 2015 Pivotal Research Group wrote:

**As we predicted, Flowers, for the first time, disclosed not one, but five class action suits** by Independent Operators who believe that they are misclassified as independent contractors and should be regarded as employees. We have searched fairly diligently and found only three such suits, the Jamestown action, a Washington D.C. action and one in Northern California. It is our view that if there are five today, there might be twenty by year end. This is a very serious exposure, discussed more fully in our May 26th report. The California suit may be the most interesting and is predicted to be certified as a class in the September time frame.

## 11.    Second Quarter 2015 Results

235.    Flowers' second quarter 2015 results were released after the market closed on August 12, 2015 via press release entitled, "Flowers Foods, Inc. Announces Results for the Second Quarter 2015" filed that day with the SEC on Form 8-K.

236.    The Individual Defendants caused the Company to announce record earnings per share and EBITDA for the second quarter ended July 18, 2015. Flowers' net income in the quarter was $51.8 million, equal to $0.24 per share on the common stock, up 23% from $42.1 million, or $0.20 per share, in the second quarter of 2014. Net sales were $888.8 million, up

73

1.8% from $872.7 million. EBITDA in the quarter was $111 million, up 16% from the same quarter last year.

237.    Also on August 12, 2015, the Company announced plans to acquire organic baker Dave's Killer Bread for about $275 million in cash.

238.    On a conference call discussing the results with analysts the following day, August 13, 2015, Shiver commented on independent contractor misclassification disputes, writing:

> As many of you are aware, several industries including packaged foods, there's been an increased number of independent contractor misclassification disputes. In our Form 10Q we note that we currently have seven misclassification complaints filed against us. It is our policy not to comment specifically regarding ongoing litigation. That being said, the distributors that sell our product are talented entrepreneurs who take the initiative to maximize opportunities within their exclusive geographic territories. We value our relationship with these individuals and we are committed to helping them grow their sales.

239.    Shiver also commented, "[o]ur sales force executed in the market winning new business and driving our branded sales, all the while providing great service and reducing sales." When asked by analyst Tim Ramey of Pivotal Research Group whether Shiver meant independent operators or "something else" when Shiver referred to the Company's "sales force," Shiver responded, "[o]ur independent operators are our sales—our independent operators did a great job this past quarter generating sales. And the company did a good job supporting the efforts of our independent operators."

240.    Flowers guidance for the full year 2015 was left unchanged, with sales expected to range between $3.786 billion to $3.861 billion, and earnings per share to range between $0.96 to $1.01.

241.    An analyst report dated August 12, 2015 by Pivotal Research Group discussed the Company's ongoing misclassification problem, stating:

**Flowers is defending five class-action suits against the company** and its subsidiaries on the question of misclassification of distributors as independent contractors vs. employees, as argued by the actions. We don't expect the company to say much of substance here but if the five suits that were disclosed with the 1Q on May 28th are now seven or eight, this will validate our thesis that plaintiffs' lawyers smell blood in the water. The risk (and number of suits) is likely to grow geometrically. FLO operates in 38 states and we would not be surprised if each state has one or more actions against FLO in the medium term. None are likely to be won or lost anytime soon, but we believe this will be the defining issue for FLO shares a year from now. Given the risk to the operating model – which we estimate at 400+ bp on EBIT margins; the potential balance sheet risk of $500 - $700 million from the potential repurchase of IO routes; the legal news flow; and the multiplying legal expense for Flowers it seems clear that the pressure on FLO's valuation will intensify.

**Jimmy Woodward, the company's CFO from 1986-2007** has come forward as a voluntary witness for the plaintiffs' and the court has allowed his deposition to be taken, scheduled for the last week of this month. ***It's a bad thing when your former CFO wants to testify against you.***

242.    On August 13, 2015, the Company filed its quarterly report with the SEC on Form

10-Q. The 10-Q contained the following disclosures:

On September 12, 2012, a complaint was filed in the U.S. District Court for the Western District of North Carolina (Charlotte Division) by Scott Rehberg, Willard Allen Riley and Mario Ronchetti against the company and its subsidiary, Flowers Baking Company of Jamestown, LLC. Plaintiffs are or were distributors of our Jamestown subsidiary who contend they were misclassified as independent contractors. The action sought class certification on behalf of a class comprised of independent distributors of our Jamestown subsidiary who are classified as independent contractors. In March 2013, the court conditionally certified the class action for claims under the Fair Labor Standards Act ("FLSA"). On March 23, 2015, the court re-affirmed its FLSA certification decision and also certified claims under state law.

At this time, the company is also aware of six other complaints alleging misclassification claims that have been filed. The company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the stage of the complaints and the claims and issues presented, the company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits.

243.    Despite disclosing that the court in the *Rehberg* Action had re-affirmed its FLSA

certification decision and also certified claims under state law, the Company continued to assert

that the misclassification lawsuits would not have a material adverse effect on the Company

despite knowing that its intentional misclassification of distributors violated federal and state

laws, stating:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, *it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.* However, adverse developments could negatively impact earnings in a particular future fiscal period.

244.    Flowers' second quarter 2015 Form 10-Q filed with the SEC on August 13, 2015,

incorporated by reference the same risk factors stated in the Company's Form 10-K for the year

ended January 3, 2015, and Form 10-Q for the quarter ended April 25, 2015.

245.    In an analyst report issued later on August 13, 2015, Pivotal Research Group

again discussed the Company's ongoing misclassification problem as well as his opinion that

Defendant Shiver described distributors as one would employees, writing,

> **The 10-Q discloses that there are now seven "misclassification" complaints up from five in the 1Q.** We learned of a new complaint just yesterday – Coyle v. Flowers was filed in Arizona in July 20[t]. We are as yet unaware of the other suit that was filed and disclosed in the 2Q 10-Q. It is our view that the number of suits will grow geometrically. In our earnings preview we wrote *"We don't expect the company to say much of substance here but if the five suits that were disclosed with the 1Q on May 28th are now seven or eight, this will validate our thesis that plaintiffs' lawyers smell blood in the water. The risk (and number of suits) is likely to grow geometrically. FLO operates in 38 states and we would not be surprised if each state has one or more actions against FLO in the medium term. None are likely to be won or lost anytime soon, but we believe this will be the defining issue for FLO shares a year from now. Given the risk to the operating model – which we estimate at 400+ bp on EBIT margins; the potential balance sheet risk of $500 - $700 million from the potential repurchase of IO routes; the legal news flow; and the multiplying legal expense for Flowers it seems clear that the pressure on FLO's valuation will intensify."*

> **During the conference call today CEO Allen Shriver made this statement:** "Our sales force executed well driving sales in the market." To us, that sounds a lot like how one would describe employees. When we asked for clarification in

the Q&A if "our sales force" referred to Independent Operators, he confirmed that it did.

### 12.    Third Quarter 2015 Results

246.    Flowers' third quarter 2015 results were released on November 11, 2015 via press release entitled, "Flowers Foods, Inc. Announces Results for the Third Quarter 2015" after the market closed and by a quarterly report, filed with the SEC on Form 10-Q on November 12, 2015.

247.    Adjusted net income per diluted share increased 9.5% year over year to $0.23. Flowers also lowered its guidance for fiscal 2015 from $3.818 billion to $3.843 billion (lowered from $3.786 to $3.861 billion) and adjusted net income per diluted share of $0.96 to $0.98 (a $0.03-per-share reduction from the top end of its previous range). Adjusted EBITDA margins in the Company's direct-store delivery business were 13.3% in the quarter, versus 13.1% a year earlier. The Company projected earnings per share for the year of $0.96 to $0.98, versus $0.96 to $1.01 that Flowers had projected at the end of the second quarter.

248.    In the conference call with analysts on November 12, 2015, to discuss the release of the Company's third quarter 2015 results, Defendant Shiver touted the Company's use of distributors to drive sales at Tastykake, stating, "Tastykake has grown sales by leveraging Flowers' DSD network in both core and expansion markets." Shiver went on to predict similar success with integrating Dave's Killer Bread: "[o]ur success integrating Tastykake products into our DSD network gives me confidence that we will execute on our plans to add Dave's Killer Bread items to our DSD routes, and extend the reach of DKB beyond the Pacific Northwest." "We're now adding D.K.B. to our existing West coast direct-store delivery network and working quickly to increase capacity and expand distribution in our core markets."

249.    During the call, Shiver also touted the Company's "broadening distribution" through expansion of the Company's DSD model:

> First, we are broadening distribution of our brands. Not only are we expanding the geographical reach of our DSD network by entering new markets, we are also growing sales in those markets that we've entered in the past five years. This quarter, expansion markets contributed 1.2% to our overall sales growth. We are working hard to keep this momentum.

250.    During follow-up questions, Kinsey acknowledged that legal expenses were increasing as a percentage of corporate costs:

> Got it. And then, I know there's probably not much you can say about the misclassification suits, but they've really proliferated. I think they've gone from five in the first quarter to seven in the second quarter to 11 today. And a lot of states like California that have different legal structures and sort of environments for labor than perhaps where you've operated in the past. Can you talk a little bit about how much legal expense is as a percent of SG&A or corporate unallocated, and what that's done? I think you called it out on the first quarter end and again this quarter.
>
> R. Steve Kinsey Chief—Financial Officer & Executive Vice President
>
> Yes. I mean, we would not specifically give that percentage of the corporate costs. You can see they are up slightly year-over-year on a quarter basis. Some of that was driven by legal expense, but just to specifically say the dollar magnitude, we would not do that.

251.    Flowers' third quarter 2015 Form 10-Q filed with the SEC incorporated by reference the same risk factors stated in the Company's Form 10-K for the year ended January 3, 2015, and its first quarter 2015 Quarterly Report on Form 10-Q for the quarter ended April 25, 2015.

252.    The third quarter 2015 Form 10-Q contained the following disclosures about the misclassification suits:

> On September 12, 2012, a complaint was filed in the U.S. District Court for the Western District of North Carolina (Charlotte Division) by Scott Rehberg, Willard Allen Riley and Mario Ronchetti against the company and its subsidiary, Flowers Baking Company of Jamestown, LLC. Plaintiffs are or were distributors of our Jamestown subsidiary who contend they were misclassified as independent

contractors. The action sought class certification on behalf of a class comprised of independent distributors of our Jamestown subsidiary who are classified as independent contractors. In March 2013, the court conditionally certified the class action for claims under the Fair Labor Standards Act ("FLSA"). On March 23, 2015, the court re-affirmed its FLSA certification decision and also certified claims under state law.

At this time, the company is also aware of ten other complaints alleging misclassification claims that have been filed. The company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the stage of the complaints and the claims and issues presented, the company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits.

253.    Despite disclosing that the court in the *Rehberg* Action had re-affirmed its FLSA certification decision and also certified claims under state law, the Individual Defendants continued to assert that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws, stating:

The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. ***While the company is unable to predict the outcome of these matters, it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future.*** However, adverse developments could negatively impact earnings in a particular future fiscal period.

254.    In an analyst report issued that same day, November 12, 2015, Pivotal Research Group again discussed the Company's ongoing misclassification problem and the "existential risk" misclassification presented to Flowers, writing:

**VALUATION: Flowers valuation remains unsustainably high in our view.** FLO trades at 27.2x our 2016 EPS estimate of $0.98 and 12.1x 2015 EV/EBITDA. Further, our SELL rating is a call on poor category dynamics and weak center of the store prospects in grocery. Given the existential risk from the exponential growth in the class-actions, FLOs valuation is clearly excessive for the low-margin, intensely competitive package bread category.

> **RISKS: Eleven class-action** [sic]**, up from three this time last year** remain the 800-pound gorilla in the room. The company is not talking much about these suits nor are they acknowledging the risk as meaningful. They didn't acknowledge them at all until May 28th. These suits have strong legal merit and pose existential risk to Flowers. We see the likelihood that there will be 20+ complaints a year from now; this is what Flowers Foods will spend all of its time on and is the single issue of focus for these shares. We might see only growing legal cost impacts in 2016, but we do expect many more class-actions to be certified. As one knowledgeable individual put it, Flowers can NEVER lose one of these and open the floodgates.

255.    Following the release of the Company's third quarter results, Flowers shares dropped 12% to close at $23.52 per share on November 12, 2015, yet remained artificially inflated because the full truth was still not revealed.

### 13.    Fourth Quarter and Fiscal 2015 Results

256.    On February 10, 2016, after the market closed, Flowers issued a press release entitled, "Flowers Foods, Inc. Reports Fourth Quarter and Full Year 2015 Results." Therein, the Company released its fourth quarter and fiscal 2015 results.

257.    Flowers fourth quarter net income was $32.2 million, or $0.15 per share, up 15% from $28 million, or $0.13. Net sales were $858.4 million, down 2%. As recently as November 12, 2015, well into the fourth quarter, Flowers projected profits of $0.22 to $0.24 per share and sales of $898 million to $922 million for the period.

258.    Net income of Flowers Foods in the year ended January 2, 2016 was $189.2 million, equal to $0.89 per share on the common stock, up 8% from $175.7 million, or $0.82 per share, in the prior year.

259.    In prepared remarks provided to analysts during the conference call held February 11, 2016 with analysts to discuss the results, Defendant Shiver addressed the Company's independent distributor model:

> We recognize that there may be some questions in the marketplace on the independent distributor business model. It is important to remember that our

competitors and others across a broad range of industries use very similar models. Flowers has utilized the independent distributor program for over 30 years. During that time, thousands of these entrepreneurs have grown their business and built wealth. As I am out in the market, I often encounter distributors and it is a pleasure to hear their stories first-hand as they talk proudly about how they've grown their business. I'm confident in the distributor program; it is good for both the distributor and good for Flowers.

Recently, we posted on our website some additional information about the program as well as a few frequently asked questions. That information can be found at FlowersFoods.com.

260. In the above reference to Flowers' website, Defendant Shiver appeared to be referring to the "Frequently Asked Questions and Answers." The statement on the website that "[a]s independent contractors, IDs control how their distributorship is run--when to operate consistent with customer needs, the order in which customers are serviced, how to nurture customer relationships, whether to hire employees, etc." is false and misleading because Flowers controls nearly all aspects of its distributors' work.

261. An analyst research report published by Pivotal Research Group on February 11, 2016 also discussed Defendants' misrepresentations that Flowers' management does not control independent distributors:

The central issue is how much management control does Flowers exercise over its Independent Distributors (IDs)? Flowers says: "As independent contractors, IDs control how their distributorship is run--when to operate consistent with customer needs, the order in which customers are serviced, how to nurture customer relationships, whether to hire employees, etc."

When you talk with IDs they will tell you that the above statement is not true. Flowers requires IDs to service customers that they refer to as "trash" stops; Dollar Stores, C-stores, drug stores. Stops where the sales per week is very low – say less than $50. At a 20% commission, the ID is stopping multiple days a week, at Flowers direction and insistence, to make $10 in commissions. These "trash" stops also tend to have very high stale rates. Flowers legal position is: IDs control how their distributorship is run—when to operate consistent with customer needs. It is quite likely that FLO legal team will make it clear that distribution center managers need to be less coercive in compelling IDs to service dollar stores, c-stores and drug stores. That will be a clear change in how the business is managed in 2016 to reduce the day-to-day control that the company has over IDs. That in

turn, will be a drag on sales – Flowers wants to sell to Walgreens but the ID does not.

262.     Defendant Shiver addressed the Company's independent distributor model on the February 11, 2016 analyst conference call in response to questions from Tim Ramey of Pivotal Research Group LLC regarding the impact to sales any changes to the distributorship model would have:

Timothy S. Ramey Pivotal Research Group LLC:

I had a question about the sales outlook versus the statement you made in the FAQ section of the independent distributor piece on your website. So, I mean, one of the key issues here is independence and how much control the IDs have over how their distributorship is run. None of these cases are going to get settled this year, I'm pretty sure. But I guess my assumption is that you would back off from some of the kind of more overt control steps, making drivers deliver to Dollar Store's, Burger King's and so on where they really don't view those as profitable stops. And that would have an impact on 2016 sales. How do you think about balancing those two needs to continue to have sales growth, but also to make sure that you're not being too aggressive on the control of their business?

Allen L. Shiver President,
Chief Executive Officer & Director:

Tim, some of the comments you just made, we do not agree with. ***Our independent distributors are independent business people. They run their business. They are in charge of their operations.*** And the items that you just mentioned are not accurate. We are continuing to be very confident in our independent distributor model. ***The lawsuits that are in place, we believe, do not have merit*** and our intention is to vigorously defend our position. And that being said, really today is about earnings and we'll be happy to take it offline if you have further questions.

263.     On February 11, 2016, following release of earnings results, Flowers shares dropped 19.72% to close at $16.81 per share. Flowers shares on February 11, 2016 were down 38% from the 52-week high of $27.31, slicing $2.2 billion off the company's market capitalization, yet still remained artificially inflated because the full truth had not yet been revealed.

264.    On February 16, 2016, the U.S. District Court for the Western District of North Carolina entered the Rehberg MSJ Order. According to a February 19, 2016, a Charlotte Observer article entitled, "Judge adds protections for N.C. workers in employee suit against bakery," Flowers issued the following statements in response to the MSJ Order:

> The ruling "is a continuation of the legal process and is not a determination of the merits of the case," the company said. "Flowers believes its independent distributor model creates entrepreneurial incentives that result in significant benefits to independent distributors, their customers and the company."

265.    On February 24, 2016, the Company filed its fiscal 2015 Annual Report on Form 10-K with the SEC ("Fiscal 2015 Form 10-K"). In its Fiscal 2015 Form 10-K, the Individual Defendants misleadingly and generically warned investors that "[c]ertain factors that may cause actual results, performance, liquidity, and achievements to differ materially from those projected are discussed in this report and may include, but are not limited to: unexpected changes in any of the following: . . . relationships with or increased costs related to our employees and third party service providers." This warning misleadingly failed to disclose that the Company was misclassifying its employees as independent contractors.

266.    The Fiscal 2015 Form 10-K claimed that Flowers "strive[s] to maintain good relationships and ongoing communications with all of our team members. We are committed to equal employment opportunities, meeting all federal and state employment laws, and striving to respect the dignity of all of our team members and associates." In truth, the Company was not committed to meeting all federal and state employment laws, and instead was committed to a "labor strategy" centered on the misclassification of its distributors as independent contractors to save on labor costs, including the payment of overtime wages.

267.    The Fiscal 2015 Form 10-K falsely stated that the Company "employ[ed] approximately 10,900 people. Approximately 1,150 of these employees are covered by collective

bargaining agreements. We believe that we have good relations with our employees." In truth, the Company at the time employed approximately 16,000 people, a figure including the Company's approximately 5,100 distributors the Company was misclassifying as independent contractors at the time.

268.    In its Fiscal 2015 Form 10-K, the Company repeatedly touted the benefits of classifying its distributors as independent contractors: "Independent distributors, highly motivated by financial incentives from their distribution rights ownership, strive to increase sales by offering outstanding service and merchandising." The Individual Defendants misleadingly stated that the Company's DSD system was "designed to provide retail and foodservice customers with superior service," when in fact the system was primarily designed as a "labor strategy" to reduce labor costs.

269.    The Fiscal 2015 Form 10-K was the first time that the Individual Defendants admitted that the Company was subject to DOL regulations and state labor laws. However, the Individual Defendants knew but failed to disclose that the Company had knowingly utilized a "labor strategy" to reduce costs and that the Company was not in material compliance with federal, state, and local laws and regulations that required its distributors to be classified as employees, stating:

> *As a producer and marketer of food items, our operations are subject to regulation by various federal governmental agencies, including* the Food and Drug Administration, the Department of Agriculture, the Federal Trade Commission, the Environmental Protection Agency, the Department of Commerce, and the *Department of Labor. We also are subject to the regulations of various state agencies, with respect to* production processes, product quality, packaging, labeling, storage, *distribution, labor*, and local regulations regarding the licensing of bakeries and the enforcement of state standards and facility inspections. Under various statutes and regulations, these federal and state agencies prescribe requirements and establish standards for quality, purity, and labeling. Failure to comply with one or more regulatory requirements could result

in a variety of sanctions, including monetary fines or compulsory withdrawal of products from store shelves.

*   *   *

The cost of compliance with such laws and regulations has not had a material adverse effect on the company's business. ***We believe that we are currently in material compliance with applicable federal, state and local laws and regulations.***

270.   The Company also described at length in its Fiscal 2015 Form 10-K its agreements with distributors, including the credit risks associated with leasing trucks, without disclosing the misclassification risks those agreements presented. In addition, Defendants misrepresented that it did not view the aggregate of $174.9 million in independent distributor notes that could potentially be charged to the Company's earnings as a "concentrated credit risk" because "each note relates to an individual distributor":

*Distributor Arrangements*.     The company offers long-term financing to independent distributors for the purchase of their distribution rights, and a vast majority of the independent distributors elect to use this financing alternative and a liability is established. These notes generally have terms of up to ten years and the independent distributor pays principal and interest weekly. A majority of the independent distributors have the right to require the company to repurchase the distribution rights and trucks, if applicable, at the original price paid by the independent distributor on the long-term financing arrangement in the six-month period following the sale of a distribution right to the independent distributor. If the truck is leased, the company will assume the lease payment (but not the lease) if the distribution rights are repurchased during the first six-month period. After the six-month period expires, the company retains a right of first refusal to repurchase these distribution rights. Additionally, ***in the event the company*** exits a geographic market or ***ceases to utilize the independent distribution form of doing business, the company is contractually required to purchase the distribution rights from the independent distributor.*** If the company acquires a distribution right from an independent distributor that is to be resold, the company operates the territory until it can be resold. ***If the distribution rights are not to be resold, the value of the distribution rights is charged to earnings. The company held an aggregate of $174.9 million and $182.2 million as of January 2, 2016 and January 3, 2015, respectively, of distribution rights notes receivable. The company does not view this aggregate amount as a concentrated credit risk, as each note relates to an individual independent distributor.*** The company has

approximately $28.3 million and $20.5 million as of January 2, 2016 and January 3, 2015, respectively, of distribution rights held for sale.

In the ordinary course of business, when an independent distributor terminates the relationship with the company, the company, although not legally obligated, generally purchases and operates that territory utilizing the leased truck of the former independent distributor. To accomplish this, the company operates the leased truck for the independent distributor, who generally remains solely liable under the original truck lease to the third-party lessor, and continues the payments on behalf of the former independent distributor. Once the territory is resold to an independent distributor, the truck lease is assumed by the new independent distributor. At January 2, 2016 and January 3, 2016, the company operated approximately 600 and 420 trucks as held for sale distributorships, respectively. Assuming the company does not resell these territories to a new independent distributor, at January 2, 2016 and January 3, 2015, the maximum contractual obligation associated with these truck leases was approximately $6.2 million and $8.1 million, respectively. There is no liability recorded in the Consolidated Balance Sheet with respect to such leases, as the obligation for each lease is retained by the former independent distributor until the distribution rights to the territory are sold to a new independent distributor. The company does not anticipate operating these territories over the life of the lease as it intends to resell these territories to a new independent distributor.

These statements were misleading because the Company ***did*** consider the aggregated amount of the notes as a concentrated credit risk.

271.    The Fiscal 2015 Form 10-K also contained the following disclosures about the misclassification suits:

On September 12, 2012, a complaint was filed in the U.S. District Court for the Western District of North Carolina (Charlotte Division) by Scott Rehberg, Willard Allen Riley and Mario Ronchetti against the company and its subsidiary, Flowers Baking Company of Jamestown, LLC. Plaintiffs are or were distributors of our Jamestown subsidiary who contend they were misclassified as independent contractors. The action sought class certification on behalf of a class comprised of independent distributors of our Jamestown subsidiary who are classified as independent contractors. In March 2013, the court conditionally certified the class action for claims under the Fair Labor Standards Act ("FLSA"). On March 23, 2015, the court re-affirmed its FLSA certification decision and also certified claims under state law. On February 12, 2016, the court dismissed the parties' respective motions for summary judgement [sic] with the exception of the plaintiffs' motions related to a waiver of state wage statute claims and waiver of the right to seek liquidated damages.

At this time, the company is also aware of seventeen other complaints alleging misclassification claims that have been filed. The company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the stage of the complaints and the claims and issues presented, the company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits.

272. Despite disclosing that the court in the *Rehberg* Action had re-affirmed its FLSA certification decision and also certified claims under state law and dismissed the respective parties' summary judgment motions, the Individual Defendants continued to assert that the misclassification lawsuits would not have a material adverse effect on the Company despite knowing that its intentional misclassification of distributors violated federal and state laws, stating:

The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, ***it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future***. However, adverse developments could negatively impact earnings in a particular future fiscal period.

273. On April 14, 2016 the Individual Defendants caused the Company to file its Definitive Proxy Statement on Schedule 14A with the SEC (the "2016 Proxy Statement"). The 2016 Proxy Statement summarizes the financial results detailed in the Fiscal 2015 Form 10-K and similarly omits and misstates the information detailed therein.

### 14. First Quarter 2016 Results

274. Flowers' first quarter 2016 results were released after the market closed on May 18, 2016 via press release entitled, "Flowers Foods, Inc. Reports First Quarter 2016 Results" and by a quarterly report filed with the SEC on Form 10-Q the next day. The Company's Form 10-Q was signed by defendants Shiver, Kinsey, and Lauder, and reaffirmed the Company's financial results announced in the press release issued on the same day.

275.    Flowers' net income in the first quarter 2016 was $59,363,000, equal to $0.28 per share on the common stock, down 3.3% from $61,389,000, or $0.29 per share, in the first quarter 2015. Net sales were $1,204,352,000, up 4.8% from $1,146,045 from first quarter 2015. EBITDA in the quarter was $138.6 million, up 1.6% from the same quarter last year.

276.    The Company's first quarter 2016 10-Q incorporated by reference the same risk factors stated in the Company's 2015 Form 10-K.

277.    In the Company's first quarter 2016 10-Q filed May 18, 2016, the Company disclosed it was defending against *23 complaints* alleging misclassification claims:

> On September 12, 2012, a complaint was filed in the U.S. District Court for the Western District of North Carolina (Charlotte Division) by Scott Rehberg, Willard Allen Riley and Mario Ronchetti against the company and its subsidiary, Flowers Baking Company of Jamestown, LLC. Plaintiffs are or were distributors of our Jamestown subsidiary who contend they were misclassified as independent contractors. The action sought class certification on behalf of a class comprised of independent distributors of our Jamestown subsidiary who are classified as independent contractors. In March 2013, the court conditionally certified the class action for claims under the Fair Labor Standards Act ("FLSA"). On March 23, 2015, the court re-affirmed its FLSA certification decision and also certified claims under state law.
>
> At this time, the company is also defending 22 other complaints alleging misclassification claims that have been filed. The company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the varying stages of the complaints and the claims and issues presented, the company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits.

278.    Despite disclosing that the *Rehberg* court had re-affirmed its FLSA certification decision and also certified claims under state law, the Individual Defendants continued to assert that the 23 misclassification lawsuits would not have a material adverse effect on Flowers despite knowing that its intentional misclassification of distributors violated federal and state laws, stating:

> The company and its subsidiaries from time to time are parties to, or targets of, lawsuits, claims, investigations and proceedings, which are being handled and

defended in the ordinary course of business. While the company is unable to predict the outcome of these matters, ***it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future***. However, adverse developments could negatively impact earnings in a particular future fiscal period.

279.     On May 19, 2016, during its conference call to discuss first quarter 2016 earnings,

Defendant Shiver touted the Company's distributor roll-out for Dave's Killer Bread during his

prepared remarks, stating:

> On April 25, just after the close of the firsts quarter, we launched Dave's Killer Bread on the DSD network. We invested significant time and money to make the launch a success. The team has not only worked with retailers to gain over 9000 new store fronts but also hosted events for distributors to come and learn about how adding DKB on their routes will grow their business.

> Feedback from the independent distributors has been really positive. Sales in these first few weeks are going well and our distributor partners are capitalizing on this momentum by gaining store space and adding special displays.

280.     During Defendant Kinsey's prepared remarks, Kinsey noted the lower distributor

distribution fees during the quarter as well as higher legal costs:

> Consolidated EBITDA for the quarter increased 1.7% to $138.6 million or 11.5% of sales. A yearoveryear decline of 40 basis points as a percent of sales. On the gross margin line, lower input costs benefitted margins by approximately 110 basis points while higher workforce cost and increased outside purchases resulted in overall gross margins being down 50 basis points to 48.4% of sales. As a percent of revenue, SG&A costs were down 10 basis points to 36.9% of sales and higher marketing and legal costs were more than offset by lower distributor distribution fees as a percent of revenue. This was driven in part by DKB and Alpine being distributed primarily through warehouse distribution in the first quarter.

> Quickly commenting on segment level results. The DSD segment sales increased 3.4% with the DKB acquisition contributing 4.5%. The majority of our retail, branded retail business in the DSD segment and during the quarter was to reduce promotions to improve prices on core branded products. This action is reflected in the overall segment price mix being slightly positive but this figure also includes the effect of price mix declines incurred in the nonretail sales category.

281.    In response to an analyst questions about SD&A for the DSD segment, the

following exchange occurred between Akshay Jagdale with Jefferies and Defendant Kinsey:

Akshay Jagdale

Okay. And just on margins. I actually thought the sequential improvement in gross margins, especially in DSD was encouraging, especially in light of some headwinds. So, one, can you tell me if you thought of it the same way but more importantly, what's going to be the overall margin impact of moving production inhouse for DKB, because it impacts various line items on the gross profit side and on the SG&A. So what's the rough when you bring this, all the production in house, what is the rough impact on overall sort of DSD margins. And secondly, SG&A, let's say or SD&A, to say especially in the DSD segment moved in the other directions, so it was up year over year.

And there was a comment about using less distributors this quarter, can you just explain that. Thank you.

Steve Kinsey:

Looking primarily at SD&A, there was an increase in overall workforce cost from a distribution perspective, so that did drive some of the increase on the DSD business. Again, when you look at we talked about sales of the territories and the routes, again, that fluctuates from time to time. There are a lot of reasons why the routes would be held for inventory or held for sale. And primarily if you want, as we look at, making it to our overall distributor agreement, we did hold back some on certain routes. Not many of those routes are being offered for sale and as we have move to Q2 I think you will see the number of routes held in inventory will drop and you will see us complete some of that activity which in turn should help the overall SD&A as a percent of revenue because you will be able to leverage and drive stronger sales through that program and leverage the cost structure on SD&A line.

282.    Analysts continued to ask about distributor routes, and the following exchange

occurred between Bill Chappell of SunTrust Robinson Humphrey, Kinsey, and Shiver:

Bill Chappell:

Two questions. One, there is something in the 10Q. I am just trying to understand that talk about reduce of number of independent distributors in the quarter versus prior and it was a temporary decrease. Can you just help me understand that?

Steve Kinsey:

Yes, Bill, if you look for the quarter, we did see a kind of ramp up in the routes held for sales in primarily, some of that's in the new markets, some of that's in the

core markets. What we did was, as we were making enhancements to our overall distributor agreement, we did pull back some selling territories. But we have completed most of those enhancements and now we are moving forward with offering many of those routes for sale now. So in Q2 you will see us selling some of those territories and you will see a reversal of the impact of some of that in Q1.

Bill Chappell:

So on that, can you give us kind of an update of where you are on updating the agreements across the country?

Steve Kinsey:

Really not getting into any specific market or specifics about the agreement, I would say, generally, again we have put in some enhancements and now we are using that agreement as we sell new territories going forward. But as far as specific numbers, we would not want to disclose that.

Allen Shiver:

Bill, I would add that from an operational standpoint, there is lot of excitement in the markets where we are actually now able to convert to independent distributors. Many of the prospective distributors have kind of been on standby for too long and lots of excitement about being able to go ahead and convert to the independent distributor model in these markets.

283.    While discussing the use of distributors and conversation of routes, the Individual Defendants failed to disclose that the Individual Defendants were intentionally misclassifying distributors as independent contractors in violation of state and federal labor laws, and therefore misleadingly touted the purported future benefit to SD&A costs.

284.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, the Individual Defendants' statements made in the above Company's earnings releases, financial statements filed with the SEC, conference calls with analysts, and presentations, all of which touted the Company's strong earnings growth attributable to acquisitions, control of labor costs, and the Company's failure to adequately disclose and meaningfully discuss the risks presented by the Individual Defendants intentionally failing to

classify its distributors as employees, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

a.  Despite boasting of the "competitive advantages" conferred by its DSD model, Defendants failed to disclose known material risks its DSD model presented arising from its misclassification of distributors as independent contractors, including total liability that could exceed $1 billion in lost wages, benefits, penalties, fines and other damages;

b.  Defendants' statements in its Fiscal Year 2012 10-K that the Company "does not view this aggregate amount [of distribution rights notes receivable, $118.5 million and $117.1 million as of December 29, 2012 and December 31, 2011, respectively] as a concentrated credit risk" were misleading because the Company did consider the aggregated amount of the notes as a concentrated credit risk.

c.  The Individual Defendants' representation that the Company was "currently in material compliance with applicable federal, state and local laws and regulations" was materially false and misleading because Defendants knew, but failed to disclose, that the Company was not in material compliance with federal, state and local laws and regulations requiring its distributors to be classified and treated as employees;

d.  Even though the Company's statements regarding current financial results, e.g. earnings, may have been literally true, the Individual Defendants misled investors about the reasons for the Company's success by omitting material information regarding the sustainability of those growing

financial results, including that the Company had achieved its earnings only by knowingly misclassifying its distributors as independent contractors to thereby reduce labor costs;

e.     The Individual Defendants materially understated the number of the Company's employees, and all risks and liabilities related thereto, by failing to include within that number the thousands of distributors that Defendants knowingly failed to classify as employees;

f.     The Company's "risk factors" were materially false and misleading when made because Defendants failed to disclose that they were knowingly violating the FLSA and numerous other state laws regarding labor standards;

g.     The Individual Defendants misled investors by failing to disclose that the Company's continued costs savings depended heavily on its "labor strategy" of willfully misclassifying its distributors as independent contractors rather than employees;

h.     While discussing the Company's integration of acquisitions into its DSD model, the Individual Defendants failed to describe how they had knowingly misclassified employees as independent contractors and that they had begun intentionally misclassifying employees in the Company's new acquisitions as independent contractors;

i.     The Individual Defendants encouraged their misclassification "labor strategy" by allowing management to openly disregard labor laws for the sake of improving margins and earnings at any and all costs;

j.    Despite claiming they "are committed to . . . meeting all federal and state employment laws," Defendants knew the foregoing misclassification of employees violated federal and state labor laws and regulations, thus subjecting Flowers to significant legal and/or regulatory penalties, yet failed to identify the DOL as a federal governmental agency that could subject the Company's operations to regulation;

k.    Though the Individual Defendants touted "lower workforce-related costs," they failed to disclose that such lower costs were actually the product of the Individual Defendants' intentional misclassification of distributors as independent contractors;

l.    The Individual Defendants' failed to disclose that the Company had been served with the Class and Collective Action Complaint filed September 12, 2012 in the *Rehberg* Action that alleged Defendants misclassified distributors on a nationwide basis as independent contractors, even though Defendants had filed an Answer in the *Rehberg* action on October 10, 2012. Moreover, given Defendants had filed an Answer in the *Rehberg* Action and the fact that Defendants knew they were intentionally misclassifying distributors as independent contractors, it was false and misleading for them to state "based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future";

m.   The Company's Fiscal 2012 Form 10-K was materially false and misleading because it failed to disclose (in violation of Item 303 of Regulation S-K) these materially adverse conditions to the market; and

n.   The SOX certifications executed by defendants Deese, Kinsey, and Lauder included the misleading representation that the Form 10-K did not contain untrue statements or material omissions, when in reality, the Individual Defendants knew but failed to disclose, or recklessly disregarded, that Flowers' reported success was predicated on, and its distribution costs artificially deflated by, the Company's improper employment practices.

**E.**   **The Truth Begins to Emerge**

285.   On August 10, 2016, the Individual Defendants disclosed in a Current Report filed with the SEC that the DOL notified Flowers that the Company was scheduled for a compliance review under the FLSA. The Individual Defendants further stated that it intended to cooperate with the Department, and that because the review process was confidential, Flowers would not comment further at that time.

286.   On this news, Flowers' stock price fell $1.60 per share, or 9%, to close at $16.15 per share on August 10, 2016, on unusually heavy trading volume.

287.   Then, after the market closed on August 10, 2016, the Company issued a press release announcing second quarter 2016 financial results. Therein, the Company announced revenue of $935 million, which fell below the Wall Street projection of $949 million. In the press release, Flowers also disclosed that it was lowering its 2016 guidance, stating:

**Revised Fiscal 2016 Guidance**

Due to increased competitive activity and weak category volumes, the company lowered its outlook for fiscal 2016 sales, diluted EPS, and adjusted diluted EPS. Sales are now expected to be in the range of $3.930 billion to $3.986 billion,

representing growth of approximately 4.0% to 5.5% over fiscal 2015 reported sales of $3.779 billion. EPS is now expected to be in the range of $0.88 to $0.93, representing a change of approximately -1.1% to +4.5% over fiscal 2015 EPS of $0.89. Adjusted EPS is now expected to be in the range of $0.90 to $0.95, representing a change of approximately -2.2% to +3.3% over fiscal 2015 adjusted EPS of $0.92.

Commenting on the revised guidance, Shiver said, "Our revised guidance takes into consideration soft consumer demand in the bakery category, as well as heightened promotional activity in our industry. The Flowers team has significant experience successfully navigating periods of heightened promotional activity like we are currently seeing, and we have already taken steps to address underperforming markets to improve profitability. Those markets have begun steady improvement, and as sales grow, the company expects to leverage costs and realize efficiencies.

288.    During the Company's earnings call with analysts on August 11, 2016, the Individual Defendants refused to address any questions about the DOL compliance review, stating:

Let me briefly comment on the filings we made yesterday with the SEC. As you may have seen, we disclosed that we received notification on August 9, from the Department of Labor, regarding a compliance review. As we stated in the filings, we are cooperating with the DOL, but beyond that, we cannot comment as the review process is confidential. That said, today's call is about our second quarter earnings results, and we ask that you please limit your questions to that topic.

289.    However, after some pressing by an analyst from KeyBanc Capital Markets, Inc. about the potential length of the review, Defendant Shiver admitted during the conference call that Defendants were not surprised by this compliance review:

It's not a surprise that the DOL, as we've seen in other categories, they have heightened attention in this whole topic. And again, if you look at our past over the years, we've had other government agencies that will conduct different evaluations and our plan is to work with them and cooperate. And again, as far as how long this could last, I mean, we'd be speculating there. But this is not a surprise and we plan to work with them as you would expect.

290.    Kinsey acknowledged increased legal costs attributable to its DSD business model: "As a percentage of revenue, SD&A costs were up 30 basis points to 36.2% of sales as

higher workforce-related costs, consulting and legal costs. . . . Also a contributing factor to DSD

margins was increased legal expense and higher corporate overhead charges."

291.     During follow-up questions regarding the Company's long-term view in light of

the Company's margins and "legal issues" with the Company's DSD business model, Shiver

revealed that the Company was focused on looking at its DSD business model to make sure the

Company was focused on margin improvement:

> Akshay Jagdale, Jefferies LLC
>
> Okay. And then just a couple longer-term questions here, and I'm going to be
> pretty blunt here, but obviously since 2012 the organic sales growth has been
> flattish, well below even your downwardly revised targets. EPS growth has been
> flat. And it seems that the competitive activity is getting worse, not better, despite
> consolidation. So I know over a 10 year period, the company has performed really
> well, but the last three years have not been good, right. So why should investors
> have confidence today that the next year or two years, three years are not going to
> be similar to the last three years where there's really been no growth and now
> competition's heating up even more. ***And then obviously, there are some legal
> issues with your business model.*** So help me with a more longer-term view from
> here.
>
> Allen L. Shiver President, Chief Executive Officer & Director
>
> Yes. Akshay, if you really look back at the last five years, this company has been
> going through a dramatic amount of growth from an acquisition standpoint.
> We've added almost 1,000 DSD routes in the last three to four years. So we've
> got a lot of opportunities from an acquisitions standpoint bringing new bakeries
> into the fold and so forth. ***Now the focus is on really settling down the business,
> looking at our business model and making sure that we're focused on not only
> growing the top line but also on margin improvement.***

292.     On this news, Flowers' stock price fell another $1.20 per share, or 7.4%, to close

at $14.95 per share on August 11, 2016, on unusually heavy trading volume.

293.     On October 21, 2016, Flowers filed a Current Report on Form 8-K with the SEC

disputing an October 20, 2016 analyst report of BMO Capital Markets which had stated that the

Company had "reiterated its confidence in resolving outstanding legal issues without a material

impact on its earnings and operations" at the National Association of Convenience Stores Conference. The Form 8-K stated, in part:

> This [BMO Capital Markets'] statement does not reflect the Company's position on its outstanding lawsuits. As previously disclosed, the Company and/or its respective subsidiaries are vigorously defending these lawsuits. Given the stage of the complaints and the claims and issues presented, the Company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits. For additional information regarding these lawsuits, the Company directs investors to the disclosure previously made in its most recent filings with the Securities and Exchange Commission.

294.     In its quarterly report for the Company's third quarter 2016 results filed with the SEC on Form 10-Q on November 9, 2016, the Company stated it was "cooperating with the DOL" with respect to the DOL's notification of compliance review under the FLSA. Flowers also acknowledged that the Company was "defending 24 complaints filed by distributors alleging that such distributors were misclassified as independent contractors. Eighteen of these lawsuits seek class and/or collective action treatment."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

295.     Plaintiff brings this action derivatively in the right and for the benefit of Flowers to redress injuries suffered, and to be suffered, by Flowers as a direct result of Defendants' breaches of fiduciary duties.

296.     Plaintiff is a current shareholder of Flowers and has continuously held Flowers stock throughout the Relevant Period.

297.     Plaintiff will adequately and fairly represent the interests of Flowers and its shareholders in enforcing and prosecuting its rights.

298.     In light of the events described herein, on September 28, 2016, Plaintiff issued the Demand pursuant to Georgia law on the Board to undertake an independent internal investigation into defendants' violations of Georgia and/or federal law, and to commence a civil action against

each of the defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties.  *See* Exhibit "A."

299.    To date, there has been no response to Plaintiff's demand.

300.    Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

301.     Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

302.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

303.    As alleged in detail herein, each of the Defendants had a duty to ensure that Flowers disseminated accurate, truthful and complete information to its shareholders. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Flowers shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

304.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

305.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

306.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

307.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Flowers.

308.     Plaintiff, as a shareholder and representative of Flowers, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III
## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14A-9 PROMULGATED THEREUNDER

309.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

310.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's 2014, 2015 and 2016 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants as detailed above, and included by reference materially false and misleading financial statements.

311.   In the exercise of reasonable care, defendants should have known that the 2014, 2015, and 2016 Proxy Statements contained misleading information and/or omitted material information.

312.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2014, 2015, and 2016 Proxy Statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Flowers and that Plaintiff is a proper and adequate representative of the Company;

B.   Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.   Directing Flowers to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.   Awarding to Flowers restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:  June 8, 2018                              Respectfully submitted,


**HOLZER & HOLZER, LLC**

/s/ Corey D. Holzer
Corey D. Holzer
Georgia Bar # 364698
Marshall P. Dees
Georgia Bar # 105776
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: (770) 392-0090
Facsimile:  (770) 392-0029
cholzer@holzerlaw.com

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com

*Counsel for Plaintiff*